## COLEMAN *et al. v.* THE STATE.

1. Where three persons were jointly indicted for murder, and one of them was first tried separately, and a panel of forty-eight jurors was put upon him, from which twelve jurors were selected, and the other thirty-six were excluded from the court-room and heard none of the evidence; and where, upon the conclusion of this trial, the other two persons indicted were placed on trial together, and a panel of jurors was put upon them which included the thirty-six jurors who had not tried the previous case, and who had been excluded from the court-room, but not those who had tried the previous case, this did not furnish a ground for challenge to the array on the ground that the whole panel put upon the accused was thereby rendered incompetent.

(*a*) It does not appear that less than a full panel of jurors was put upon the accused, nor was any error assigned on that ground.

(*b*) If there was any objection to individual members of the panel, this furnished ground for challenge to the polls, not to the array.

(*c*) The sixth amendment to the constitution of the United States has no relevancy to an occurrence of the character above mentioned, on a trial in a State court.

(*d*) The method of procedure mentioned involved no violation of the fourteenth amendment to the constitution of the United States.

2. Where three persons were jointly indicted for murder, if a prima facie case of conspiracy among them was shown, either by direct or by circumstantial evidence, testimony as to the acts and declarations of one of them, during the pendency of the criminal project and connected therewith, was admissible against the other two, although they were tried separately.

(*a*) The evidence tending to show a conspiracy among the three persons who were jointly indicted, to kill the man who was slain, was sufficient to authorize the testimony in regard to the acts and declarations of one of them to which objection was made, and also to authorize a charge submitting ultimately to the jury whether or not there was a conspiracy, and instructing them that if there was none to disregard such evidence. (Atkinson, J., dissents from the ruling announced in the subdivision immediately preceding.)

3. There was no error in admitting evidence to show that one of the defendants on trial had made conflicting statements as to the manner in which the homicide was committed, some of which did not accord with his statement on the stand.

4. Charges given at the request or insistence of counsel for the defendant furnished no ground for granting a new trial at his instance.

5. While section 71 of the Penal Code of 1910, in dealing with the subject of reasonable fears as a ground of defense on a trial for homicide, uses the expression "the fears of a reasonable man," the employment of the expression "as reasonably courageous and self-possessed men," in instructing the jury, does not furnish cause for a new trial.

6. The verdict was supported by the evidence, and none of the grounds of the motion for a new trial require a reversal.

MAY 15, 1914. REHEARING DENIED JUNE 15, 1914.

Indictment for murder. Before Judge George. Wilcox superior court. January 27, 1914.

*John R. Cooper, Haygood & Cutts,* and *D. B. Nicholson,* for plaintiffs in error.

*T. S. Felder, attorney-general, J. B. Wall, solicitor-general, Hal Lawson,* and *J. W. Dennard,* contra.

LUMPKIN, J. W. A. Coleman, Jim Coleman, and W. H. Stevens were indicted for the murder of Leon Melvin. W. A. Coleman was first tried separately and convicted. Jim Coleman and W. H. Stevens were then placed on trial together. They were found guilty, with a recommendation to mercy. They moved for a new trial, which was denied, and they excepted.

1. On the trial of W. A. Coleman a panel of forty-eight jurors was put upon him, from which were selected the twelve who tried him. The remaining thirty-six were excluded from the court-room, and heard none of the evidence. After his conviction the case against the other two defendants was called, and a panel of jurors was put upon them. It did not include the twelve men who tried the previous case, but it included the thirty-six men who had not been engaged in that case, and who had been excluded from the court-room. Presumably a full panel was put upon them, which included the thirty-six jurors mentioned. At any rate, no objection was made to the number of jurors in the panel. Counsel for the defendants challenged the array on the grounds that the whole panel was incompetent. The challenge to the array was properly overruled. If there was any objection to individual members of the panel, this would be a ground for challenge to the polls, not to the array. But we do not mean to imply that there was any

ground of challenge either to the polls or to the array. *Schnell* v. *State*, 92 *Ga.* 459 (17 S. E. 966); *Brown* v. *State*, 97 *Ga.* 215 (22 S. E. 403); *Bryan* v. *State*, 124 *Ga.* 79 (52 S. E. 298), and citations; *Robinson* v. *State*, 82 *Ga.* 535 (4), 545 (9 S. E. 528).

It has been repeatedly ruled that the sixth amendment to the constitution of the United States has no application to trials in State courts. *Brantley* v. *State*, 132 *Ga.* 573(b), 579 (64 S. E. 676, 22 L. R. A. (N. S.) 959, 131 Am. St. R. 218, 16 Ann. Cas. 1203); *Eilenbecker* v. District Court of Plymouth County, 134 U. S. 31 (10 Sup. Ct. 424, 33 L. ed. 801). It is equally well settled that there is no merit in the contention that this proceeding was violative of the fourteenth amendment to the constitution of the United States. *Rawlins* v. *Georgia*, 201 U. S. 638 (26 Sup. Ct. 560, 50 L. ed. 899); *Brantley* v. *State*, supra, and citations.

2. Objection was made to several parts of the evidence which were only admissible either as tending to show a conspiracy, or on the basis of a conspiracy; and error was also assigned on certain charges on the law of conspiracy. It was contended that the evidence was irrelevant, and that there was no sufficient evidence of a conspiracy on which to base its admission or the charges on that subject. After the fact of conspiracy is proved, the declarations of any one of the conspirators, during the pendency of the criminal project and connected therewith, are admissible against all. Penal Code (1910), § 1025. While it may generally be the better practice to require a prima facie case of conspiracy first to be made, before admitting evidence of the acts and declarations of one of the alleged conspirators, there is no inflexible rule to that effect. The trial court has some discretion as to the order in which testimony may be introduced; and if a prima facie case of conspiracy is shown from the whole evidence, the admitting of such testimony is not error. Unless, however, a conspiracy is shown prima facie, such evidence can only operate against the person whose acts and declarations are proved, if he is on trial; or if he is not on trial, they are not admissible against the defendants being tried, and should be rejected. 8 Cyc. 682. If sufficient prima facie evidence of a conspiracy is introduced to authorize the admitting of evidence of acts and declarations of one of the alleged conspirators, ultimately it is for the jury to determine whether, from the whole evidence, a conspiracy has been shown; and if they find that none has been established, it is then their duty not to consider the acts and declarations

of the supposed co-conspirator which has been admitted, except so far as they may affect him, if he is on trial. 3 Enc. Ev. 428. As to the admissibility of the evidence, if a prima facie case of conspiracy is shown, it does not matter whether the supposed conspirator whose acts or declarations are proved is on trial or not. *Slaughter* v. *State*, 113 *Ga.* 284, 288 (38 S. E. 854, 84 Am. St. R. 242). A conspiracy may be shown by circumstantial evidence as well as by that which is direct. *Weaver* v. *State*, 135 *Ga.* 317 (69 S. E. 488) ; *Walker* v. *State*, 136 *Ga.* 126 (70 S. E. 1016) ; *Turner* v. *State*, 138 *Ga.* 808, 812 (76 S. E. 349).

There was sufficient evidence in this case to authorize the jury to find that there was a conspiracy between the three persons charged with the murder of Leon Melvin, and there was no error either in the admission of evidence or in giving charges on the subject of a conspiracy. There was evidence tending to show the following among other facts: There had been ill feeling between Leon Melvin (the person killed) and the elder Coleman prior to the time of the homicide. The latter testified: "On the night that Leon Melvin shot into my commissary I was armed. I always carried my pistol after that night if I left the place after night, walking around the lot or any place. I generally taken it with me. I have carried them in the daytime." Some person shot into the house of Leon Melvin's father prior to the homicide. On the night before this occurred the elder Coleman went to the house of the senior Melvin and had a conversation with him, the younger Melvin being present. Coleman told young Melvin to go outside and they would settle up right there. The elder Melvin told Coleman to leave, which he did. On the day before the homicide the elder Coleman told a witness that he liked the elder Melvin and had nothing against him, but used a vile epithet in regard to young Melvin, and said, "We are going to hand him a package." On the next day, which was Sunday, the two Colemans (father and son) and Stevens were together, all armed. A pistol was seen in the pocket of Jim Coleman, the son, while in church. Later the elder Coleman had his buggy across the road, when one Miller and another person with him drove up and asked Coleman to get out of the road. An altercation ensued between the two Colemans and another person with them and Miller and the person with him, resulting in a fight between the elder Coleman and Miller. Stevens was present, also

armed. While the controversy was in progress, young Melvin was standing near by, but taking no part in the difficulty. The elder Coleman said to him, "I did shoot your damned daddy's house, and I will shoot you," or words to that effect. · On that afternoon young Melvin left the house of· a witness in order to go home. He did not go the nearest way, but took a road which was about two miles out of the way. If he had gone. the nearest way, he would have passed Coleman's house, and he told the witness that he was scared to go that road. Late in the evening the two Colemans and Stevens were in a buggy together. They turned out of the road along which they were first driving, into the road which young Melvin had taken in order to go home, and thus met him about dark. They all fired upon him, killing him, with no further provocation. Afterward they went together to the house of the elder Coleman, where they were arrested. In his statement Stevens detailed an occurrence in which he said, that young Melvin had sought to get the son of Stevens to go with him in order to have a difficulty with another person; that Stevens had refused to allow the boy to go; and that later young Melvin had tried to raise a difficulty with the son of Stevens and had started to draw a pistol on Stevens himself; but the accused said he thought nothing of that, and had had no trouble with Melvin until they met in the road on the day of the homicide, when Melvin started shooting into the buggy where Stevens and the two Colemans were riding. There was evidence on behalf of the defendant, conflicting with or seeking to explain some of that of the State; but the jury were authorized to find the above-stated facts. The evidence was sufficient to show a prima facie case of conspiracy, and to authorize the charge on that subject. The elder Coleman having had harsh words with young Melvin prior to the date of the difficulty, Stevens declaring in his statement that Melvin had tried to draw a pistol on him, though he thought nothing of it, the two Colemans (father and son) and Stevens having been together on Sunday armed, and there being evidence of the transactions above stated, the jury might well have believed that the three were in a conspiracy to kill Melvin. Exactly when it was formed does not appear from direct evidence— it rarely ever does, and yet the conspiracy usually precedes the performance of the act,—but the jury might have found that it antedated the coming together of the three. with pistols on Sunday,

when they were apparently acting in concert, and extended as far back as the preceding day, when the elder Coleman said, "We are going to hand him a package." There was, under the facts of this case, no error in admitting evidence of that statement, and of what occurred at the time of the difficulty with Miller. Nor was there error in admitting evidence that sometime before the homicide some one shot into the house of the elder Melvin. Standing alone this might not be admissible. But, when taken in connection with the other evidence on the subject above indicated, it was shown to be connected with the homicide and to indicate motive for it. 2 Whar. Cr. Ev. (10th ed.) § 919.

When the evidence of the threat was offered and objection thereto was made, the court admitted it upon the statement of the solicitor-general that its relevancy would be made to appear later, and the objection does not seem to have been again brought to his attention. He left the jury to finally decide whether or not there was a conspiracy, and substantially charged in accordance with what is said above. If the question of admitting this evidence should be considered as close, under the facts of the case, the ruling would not require a new trial.

3. There was no error in admitting evidence to show that one of the accused persons on trial had made conflicting statements as to the manner in which the homicide was committed, some of which did not accord with his statement on the stand.

4. According to the notes added by the presiding judge to the motion for a new trial, several of the charges of which complaint was made were given at the instance or request of counsel for the accused. Of course, they furnish no reason for granting a new trial.

5. While section 71 of the Penal Code, in dealing with the subject of reasonable fears as a ground of defense on a trial for homicide, uses the expression that "it must appear that the circumstances were sufficient to excite the fears of a reasonable man," etc., in instructing the jury the use of the expression "as reasonably courageous and self-possessed men" does not furnish cause for a new trial. *Teal* v. *State,* 22 *Ga.* 75 (3); *Gallery* v. *State,* 92 *Ga.* 463 (3), 464 (17 S. E. 863); *Dover* v. *State,* 109 *Ga.* 485 (2), 487 (34 S. E. 1030).

6. There were several other grounds of the motion for a new trial, but they do not require separate discussion. None of them

are such as to necessitate a reversal. The evidence authorized the verdict.

*Judgment affirmed. All the Justices concur, except Atkinson, J., dissenting.*