WORTHAM *v.* THE STATE.

No. 11877. September 14, 1937.

*Henry A. Stewart* and *Astor Merritt,* for plaintiff in error.

*M. J. Yeomans, attorney-general, Hal C. Hutchens, solicitor-general,* and *Ellis G. Arnall, assistant attorney-general,* contra.

JENKINS, Justice. Robert Wortham was indicted jointly with Gilbert Evans and Mose Evans for the murder of Otto Wright by a shot from a gun. Upon a severance of the defendants, Wortham alone was tried and convicted, with a recommendation to mercy. He excepted to the refusal of a new trial on the general and on special grounds. Under the undisputed evidence, the actual shot was not fired by Wortham, but there was evidence indicating that it was fired by Gilbert Evans, who was shown to have held the gun just previously. The deceased was present merely as a by-stander, coming from a near-by church for a drink of water, did nothing to justify or provoke any assault, and there was no testimony which would have authorized a verdict of either voluntary or involuntary manslaughter. The State contends, that, even though Wortham did not fire the fatal shot, the intent of the person firing would be imputed to him and he was guilty of the murder, because the homicide took place in the execution of a conspiracy between Wortham and the two Evans brothers to engage in the unlawful enterprise of "cleaning out" or damaging the drink-stand of Jack Johnson, where the killing occurred. According to the uncontroverted testimony, the three defendants jointly indicted rode out together in an old automobile at about 5 o'clock on a Sunday afternoon. In his statement to the jury Wortham said that he had been staying at the tenant-place of Gilbert Evans; that the wife of Mose Evans drew on her husband a shotgun, belonging to Gilbert Evans; that after Wortham took it away from her, and put it under a mattress in the house of Gilbert Evans, Evans took it and put it in the automobile, which belonged to Gilbert Evans. As to the events following, the testimony shows that the three defendants, driving together in the car, stopped, about 5 o'clock in the afternoon, at the home of an insurance agent, where Gilbert Evans paid a premium and Wortham took out a small policy. The three then stopped at the place of business of Denman, about 150 yards from the drink-stand of Jack Johnson. Denman saw "something in the back seat . . covered up with a canvas," but could not tell what it was. Wortham was introduced to Denman by a different name. Gilbert

and Mose Evans tried to buy whisky from Denman, and, upon his refusal, produced a bottle from which they tried to make him drink. About 30 minutes later, Denman heard the fatal shot. Preceding the firing, and (according to the testimony of one witness) at some time between sunset at 7:06 p. m. and "dusky dark," or (according to the testimony of another) at around 7:30 or later, the three defendants went to the house of Mrs. Mattie Hicks and Mrs. Lillian Hicks, where Gilbert Evans tried to engage a room for Mose Evans, who Gilbert Evans said was in trouble at Rome and needed a boarding place. Wortham and Mose Evans got out of the car, and were scuffling. "They couldn't walk, kind of staggered."

Over the objection of the defendant Wortham, Mrs. Lillian Hicks was permitted to testify as to a statement made at her home on this occasion by Gilbert Evans to her, but outside of the immediate presence of Wortham. This was that Gilbert Evans "couldn't see [Jack Johnson], that he had it in for him, that they give him a dirty deal, and Jack didn't like him; . . that they had a fight over there, and some of them got bloody and wanted to go in and wash,· and he wouldn't let them go in; he put somebody out of the back window and called the law, and the law tried to arrest them; he said he come over there, but didn't arrest them, and he said they wouldn't arrest them. . . He said he would get even with him, Jack Johnson." As to the actual occurrence of the trouble, one of the State's witnesses, who was present on the occasion referred to by Mrs. Hicks and in the alleged statement, testified that Johnson then assisted Evans, and "there had not been any trouble between Jack Johnson and Gilbert Evans and Mose Evans."

The uncontradicted testimony shows, that, after driving from the Hicks home, the three defendants stopped their car near the drink-stand of Jack Johnson. Wortham, who was under the influence of liquor, told those in charge that his name was Bob Hammond (although he denied this in his statement to the jury), ordered and drank a can of ale, and asked particularly as to just what time of night Johnson would be back. He requested that the ale be charged to Johnson, and, upon refusal, paid for it. Mose Evans then came in with a knife in his hand, cursing, and, upon being requested by those in charge not to create a dis-

turbance, threatened to "shoot the place up." Wortham then "got him by the arm and told him to 'Let's go,' and got just on the outside of the door, and Gilbert met them and took him on the other side of the hand, and led him across the cement culvert" toward the parked car in which the defendants came. One witness testified, that, when the defendants left, "Some one hollered, 'Come on. I wouldn't buy nothing from that pimping son of a bitch, Jack Johnson.' That statement came from them three men." They returned to the automobile, where an argument ensued as to who should drive. According to the testimony for the State, one said, "If you don't let me drive, I am going back out there and *clean* out that place." According to the defendant's statement, Mose Evans, in the argument with his brother Gilbert, only said, "If you think I am too drunk to drive, I will go back to Jack's, and *drink* him out," and Gilbert said, "That suits me." The three then went back. There was testimony that the motor was left running; that the witness talked with two men whose appearance tallied with that of the Evans men; and that one carried a shotgun. The witness "asked them if they were expecting trouble, and they said, 'No,' and I says, 'I allowed you was by being out here with a shotgun on Sunday night;' and the best I remember, they said they had borrowed it and was carrying it back." Other witnesses identified Gilbert Evans as the one who had the gun. When the employees of the Johnson place saw the defendants coming back, they cut out the lights and closed up the place. It was shown that an electric clock there stopped at 8:14 p. m. As to any other weapon beside the gun, the State's testimony showed that on the first visit to the drink-stand Mose Evans had a knife; but one witness testified that on the second visit "Wortham had the knife." There was no evidence that he used or attempted to use it. Wortham requested the deceased, Otto Wright, to "open up the stand; he wanted some beer." Wright said that he could not, did not work there, had no key, and for them to search him if they thought he had. Employees told the defendants that Wright had nothing to do with the place. One defendant, unidentified, took him by the belt. Mose Evans was left with Wright; and after further talk between the defendants and employees, Wortham grabbed one of them, Bob Smith, cursed him, and said, "Get up and get out from here."

Later Wortham said, "Let's mob him." Smith struck Wortham with a chair, Mose Evans picked it up and threw it at Smith, who ducked and drew back to hit again, but was then knocked unconscious, with a cracked jawbone and an ear split open. Another employee came out of the stand, and one of the defendants hit him with "something that felt like a chair," and he fell. As he started to get up, Wortham cursed him, grabbed him by the arm, and twisted it. Gilbert Evans came up from behind the gas-tank, between it and the main road, and, while Wortham had hold of the employee, struck the employee "across the shoulder and mouth with the gun." Wright, the deceased, was then on the left side of the door. The employee when hit jerked loose and ran beyond the drink-stand toward a pine tree, and as he got even with it he "heard the gun fire in front of the stand." Wright was seen lying on the ground, and soon died from the gunshot wound. On the next morning the defendants were arrested by a deputy sheriff, at the house of Gilbert Evans. Wortham was lying on the floor, and all were in a "stupid drunk" condition, with whisky in a bottle on the floor. Wortham's knuckles and hands were badly skinned. In his statement to the jury, besides denying that he had told the drink-stand employees that his name was Bob Hammond, and stating that he had said it was Bob Wortham, the defendant denied that he went to the place of Jack Johnson or any other place "with any intention of having any trouble or assisting any one else in any way;" and said that if either of the other defendants had any intention of having any trouble with any one, "I did not know anything about it, they never mentioned it to me;" that he had known Jack Johnson since Johnson boarded with the father of Wortham's wife several years previously; that when the two Evans men stated they were going back to the stand the second time, he decided to go, because "I began worrying, and then I decided I would go with them and keep them from getting any fuller or have any trouble or anything;" that he got out of the car first, and "did not see Mose or Gilbert either take the gun out of the car when they left, though I didn't pay any particular attention, for it had never entered my mind that such a thing would occur," and did not know, until the gun was fired by a man "dressed" like Gilbert Evans and he (Wortham) saw Wright fall to the ground, that Gilbert Evans

"had taken the gun out of the car;" that all he, Wortham, did in the altercation before the firing "was to fight with [Smith, the employee], and didn't do that until he had hit me;" and that he (Wortham) "didn't fight him with anything but my fist," and had no weapon.

In the special grounds, Wortham, excepts to the court's failure, on written request, to charge the jury on the law of voluntary and involuntary manslaughter, under testimony quoted in the ground. Also, to the admission of the testimony, above quoted, of Mrs. Lillian Hicks, as to the statement by Gilbert Evans to her just before the homicide, with regard to his feeling toward Jack Johnson and his intention to "get even with" Johnson, over the objection that this statement was made out of the presence of Wortham. The defendant further excepts to the following instruction: "The existence or non-existence of a conspiracy may be proved by acts and conduct, as well as by express agreement. In other words, in order to make out a conspiracy, it is not necessary to prove that there was an express agreement. If the State has shown beyond a reasonable doubt, by proof of acts and conduct, or by circumstantial evidence or any kind of evidence admitted before you, that there was a conspiracy or common purpose on the part of these defendants to do an unlawful act, *or any two of them,* then of course, if you believe that, the conspiracy would be established." The ground of the exception is that the italicized language, taken with the rest of the charge, instructed the jury to find the defendant guilty of a conspiracy and of murder, if any two of the defendants, who might have been Gilbert Evans and Mose Evans, conspired to do an unlawful act, and even though Wortham was not a party to such a conspiracy.

■ The evidence showing without dispute that the homicide was committed without any legal justification or provocation; and there being no evidence to indicate that the firing of the gun was the result of an unintentional mishap, the court did not err in refusing the request to charge the jury on the law of voluntary and of involuntary manslaughter.

■ After the fact of conspiracy is proved, the declarations of any one of the conspirators during the pendency of the criminal project, are admissible against all. Code, § 38-306. This is true even though the person against whom the declaration is introduced

is being tried separately from the person making the declaration. *Slaughter* v. *State,* 113 *Ga.* 284 (2), 288 (38 S. E. 854, 84 Am. St. R. 242) ; *Coleman* v. *State,* 141 *Ga.* 731 (2), 734 (82 S. E. 228). The conspiracy itself may be proved by circumstantial as well as direct evidence. *Gossilt* v. *State,* 182 *Ga.* 535 (*a*), 537 (186 S. E. 417) ; *Dixon* v. *State,* 116 *Ga.* 186 (9) (42 S. E. 357) ; *McLeroy* v. *State,* 125 *Ga.* 240 (2), 243 (54 S. E. 125) ; *Weaver* v. *State,* 135 *Ga.* 317 (69 S. E. 488) ; *Walker* v. *State,* 136 *Ga.* 126 (70 S. E. 1016) ; *Turner* v. *State,* 138 *Ga.* 808, 812 (76 S. E. 349) ; *Young* v. *State,* 151 *Ga.* 401 (107 S. E. 37). In order properly to admit the declaration of an alleged co-conspirator made during a criminal project, there must be sufficient evidence aliunde the declaration to establish the conspiracy at least prima facie and prove its existence beyond a reasonable doubt. But the trial judge having a sound discretion as to the order of proof, "if a prima facie case of conspiracy is shown from the whole evidence, the admitting of such [a declaration] is not error. . . If sufficient prima facie evidence . . is introduced to authorize the admitting of evidence of acts and declarations of one of the alleged conspirators, ultimately it is for the jury to determine whether, from the whole evidence, a conspiracy has been shown" beyond a reasonable doubt; and if they thus find that none has been established, it is then their duty not to consider the testimony of acts and declarations of the supposed co-conspirator which has been admitted. *Coleman* v. *State,* supra; *Horton* v. *State,* 66 *Ga.* 690, 693; *Barrow* v. *State,* 121 *Ga.* 187 (3) (48 S. E. 950) ; *Tompkins* v. *State,* 17 *Ga.* 356; *McDaniel* v. *State,* 103 *Ga.* 268 (3), 270 (30 S. E. 29) ; *Smith* v. *State,* 148 *Ga.* 332, 338 (96 S. E. 632) ; *Wall* v. *State,* 153 *Ga.* 309 (2) (112 S. E. 142) ; *Smith* v. *State,* 47 *Ga. App.* 797, 801 (171 S. E. 578). There being sufficient facts and circumstances to authorize the jury to believe beyond a reasonable doubt that an unlawful conspiracy existed between the defendant on trial and his two alleged co-conspirators, one of whom it is alleged made the declaration referred to and was the actual perpetrator of the homicide, such declaration was properly admitted against this defendant as tending to establish the crime and guilt of murder. See *Harris* v. *State,* 184 *Ga.* 382 (191 S. E. 439 (7), 445).

■ It was error, likely to have been very prejudicial, to charge

the jury in effect that the State's contention of conspiracy would be established if the jury believed beyond a reasonable doubt that there was a conspiracy or common purpose between "any two" of the three defendants, not necessarily including the defendant on trial. On this ground alone a new trial must be granted.

*Judgment reversed. All the Justices concur, except Beck, P. J., and Bell, J., absent because of illness.*