34611, 34612. GUNTER v. THE STATE (two cases).

PER CURIAM.

The appellants, Tommy and Gail Gunter, who are husband and wife, were convicted in the Barrow Superior Court of the murder of Betty Parsons, who was Tommy Gunter's ex-wife. The appellants received sentences of life imprisonment. This is the appeal from their convictions.

The evidence presented at trial showed the following:

Tommy Gunter and Betty Parsons, formerly Betty Gunter, were divorced in 1973. Betty obtained custody of their minor child, Shane Gunter, and Tommy was ordered to pay child support. Betty later married Gary Parsons. Tommy married Gail Gunter. Tommy and Gail Gunter were extremely rankled by the fact that Tommy had to continue paying child support to Betty after she had married Gary Parsons. In June of 1977, Tommy was held in contempt of court for failure to make child support payments.

Gary Parsons testified that in July of 1977, he had gone to Tommy Gunter's trailer to discuss his adoption of Shane Gunter. Parsons testified that Tommy Gunter had told him "that he couldn't afford to pay 'em any more, that he wasn't going to pay them any more . . . and that he's gonna have to kill her [Betty Parsons] or something or move out of state or something like that." Parsons further

testified that on that occasion Gail had said to him that, "her parents had enough money where they could have something like that done."

Several other witnesses testified as to statements made by Tommy Gunter in which he complained of having to pay child support to Betty and threatened to kill her if she persisted in her efforts to have him continue paying child support.

Danny Whitehead testified as follows: In or around June of 1977, he had sold two trucks to Tommy Gunter. Gunter told him that he was having problems with his ex-wife and that he would like to see her dead. This conversation took place at the Union Point Lumber Co., where Whitehead and Gunter had other business dealings. Whitehead was living with Jimmy O'Dillon at the time, and O'Dillon told him that he was a "hit-man." Whitehead agreed to arrange for O'Dillon to kill Gunter's ex-wife. Whitehead served as an intermediary between O'Dillon and Gunter, and eventually it was agreed that O'Dillon would kill Betty Parsons for $2,000. At O'Dillon's request, Whitehead wrote Tommy's phone number and Betty Parsons' name and address on a small piece of paper. (This paper was introduced in evidence as an exhibit.) During the first part of August, Whitehead went to Tommy Gunter's trailer to collect some money. Tommy was not there, but Gail had a conversation with Whitehead, and she told him that if "this man" did not kill Betty Parsons, she would kill "the bitch myself." Later, a meeting was arranged between Tommy Gunter, O'Dillon, and Whitehead at the Union Point Lumber Company. A few days before the killing occurred, Gail told Whitehead on the telephone that if "ya'll have it done by 12:00 o'clock on Friday night, I'll go to bed with you." She also agreed to go to bed with O'Dillon. In addition, she said that if Tommy could not get the money, "If I ain't got it, daddy will get it. Daddy's got it. I can get it from him."

Walter Stone, who conducted business at the Union Point Lumber Company, testified that, during the summer of 1977, he saw Tommy Gunter, Danny Whitehead, and a third individual, whom he could not identify, together on the grounds of the lumber company. The description Stone gave of the unidentified third party

fits the description of O'Dillon.

Wayne Self testified that, during the first week of August in 1977, O'Dillon and Whitehead had approached him "to have a set up, to kill a lady of this man that was supposed to go to court against her." Self further testified that O'Dillon had told him that the man "wanted the woman killed over a divorce or something like this and he needed to get this lady out of the way . . ." They wanted Self to obtain a high-powered rifle for them. Self refused, and he notified law enforcement officials of O'Dillon's and Whitehead's plans.

Whitehead and O'Dillon obtained a shotgun elsewhere. On the evening of August 12, 1977, they drove O'Dillon's truck to Betty Parsons' home in Winder, Georgia. Whitehead drove the truck into the driveway, blew the horn twice, and then backed the truck down the road. Meanwhile, O'Dillon got out of the truck. The door leading to the house from the carport was locked. O'Dillon kicked it down and entered the house. He proceeded to shoot Betty Parsons to death with the shotgun. Shane Gunter, Tommy's and Betty's son, was also present, but he was not harmed. Whitehead and O'Dillon returned to O'Dillon's trailer in Jackson County, and they were arrested by the police that evening.

Other evidence will be reviewed as is necessary for a consideration of the enumerations of error raised.

1. In the first enumeration of error, both of the appellants argue that the trial court erred in overruling their challenge to the array of the petit jury, which was brought on the ground that the petit jury panel for the week the appellants were tried (Monday, February 27, 1978 through Thursday, March 2, 1978) contained the names of jurors who had served on the jury panel during the previous week (beginning Monday, February 20, 1978).[1] The appellants argue that this was in violation of Code § 59-710, which provides: "When the superior court is held for longer than one week, the presiding judge shall draw separate panels of petit jurors for each week of the

---

[1] The appellants' accomplice, James O'Dillon, was tried in the Barrow Superior Court the week of February 20, 1978.

court."

As authority for their position, the appellants cited before the trial court, and they cite on appeal, the case of *Bridges v. State,* 103 Ga. 21 (2) (29 SE 859) (1897). See also *Cochran v. State,* 62 Ga. 731 (1879). Cf. *Cochran v. State,* 113 Ga. 736 (39 SE 337) (1901). The appellants' reliance on *Bridges* is misplaced. In that case, the jurors held over from the first week were used as tales jurors in addition to the regular jurors called for the second week. Since they were not properly summoned as jurors (see Code Ann. § 59-711), they could not so serve.

In our opinion, the case is controlled by Code Ann. § 24-3009, which provides, in pertinent part, that: "The judges of the superior courts may, in their discretion, hold adjourned terms of said courts in any court within their respective circuits, when the business requires it to close the dockets, and may, in the exercise of a sound discretion, cause new juries to be drawn for the same, or *order the juries drawn for the regular term to give their attendance upon such adjourned terms . . .*" (Emphasis supplied.) Under this section, the trial judge may adjourn court and hold the jurors over to the adjourned session. *Harris v. State,* 191 Ga. 243 (12 SE2d 64) (1940); *Buchanan v. State,* 118 Ga. 751 (45 SE 607) (1903); *Cribb v. State,* 118 Ga. 316 (45 SE 396) (1903); *Brinkley v. State,* 54 Ga. 371 (1875). Since it is presumed that the trial court proceeded legally (*Hudgins v. State,* 61 Ga. 182 (1878)), it is incumbent on the defendant to show that the trial court was not meeting pursuant to adjournment. They have not done so here. Accordingly, we find this enumeration of error to be without merit.

2. In the second enumeration of error, both of the appellants argue that the trial court erred in overruling their motions for directed verdicts of acquittal, on the ground that the testimony of accomplice Whitehead was not corroborated, as required by Code § 38-121.

As we have recently stated in *Reaves v. State,* 242 Ga. 542 (250 SE2d 376) (1978): "The rule is well settled in this state that to sustain a conviction in a felony case upon the testimony of an accomplice, there must be corroborating facts or circumstances which, in themselves and independently of the testimony of the accomplice, directly

connect the defendant with the crimes or lead to the inference that he is guilty, and which are more than sufficient to merely cast on the defendant a grave suspicion of guilt. Code § 38-121; *Carter v. State,* 237 Ga. 617 (229 SE2d 411) (1976); *Smith v. State,* 236 Ga. 12, 15-16 (222 SE2d 308) (1976); *West v. State,* 232 Ga. 861, 864 (209 SE2d 195) (1974); *Allen v. State,* 215 Ga. 455, 457 (111 SE2d 70) (1959); *Price v. State,* 208 Ga. 695 (69 SE2d 253) (1952). However, the corroborating evidence need not of itself be sufficient to warrant a conviction of the crime charged. *Smith v. State,* 238 Ga. 640 (235 SE2d 17) (1977). Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. *Birt v. State,* 236 Ga. 815, 826 (225 SE2d 248) (1976)."

As held by the Court of Appeals: "While a conviction based entirely upon the testimony of an alleged accomplice, uncorroborated by other competent evidence, will not be allowed to stand, corroboration is peculiarly a matter for the jury, and sufficient corroboration may consist of either direct or circumstantial evidence which connects the defendant with the crime, tends to show his participation therein, and would justify an inference of the guilt of the accused independently of the testimony of the accomplice. *Parker v. State,* 86 Ga. App. 497 (71 SE2d 765); *Evans v. State,* 27 Ga. App. 316 (2) (108 SE 129); *Davis v. State,* 25 Ga. App. 532 (2) (103 SE 819)." *Haire v. State,* 89 Ga. App. 629 (1) (80 SE2d 497) (1954). Accord, *Nooner v. State,* 131 Ga. App. 563, 566 (206 SE2d 660).

Thus, the evidence corroborating the accomplice's testimony does not have to be sufficient in and of itself to support a verdict of guilty; circumstantial evidence tying the defendant to the crime and justifying an inference of guilt is satisfactory. We find that here.

The independent, corroborating evidence consisted of evidence of: prior difficulties between the parties persisting until the time of the killing and showing motive; prior threats against the victim, testimony of another witness that appellants' accomplices had attempted to enlist him in a murder conspiracy fitting the description of this one. (In addition, Gail's willingness to

have her father finance the killing was corroborated by Gary Parsons' testimony.)

When considered cumulatively, the foregoing evidence was sufficiently corroborative of Whitehead's testimony so that the trial court did not err in overruling the appellants' motions for directed verdicts of acquittal and submitting the case to the jury.

3. In Tommy's third enumeration of error, he argues that the trial court erred in admitting in evidence the records of the divorce and contempt proceedings between himself and the victim; Tommy argues that this evidence impermissibly placed his character in issue and concerned events which were too remote in time to have any relevance to the issues at trial. We disagree.

In a murder prosecution, evidence of prior quarrels and difficulties between the defendant and the victim, which persist until the time of the killing, thereby shedding light upon the motive of the killing and explaining conduct, is admissible. See *Roberts v. State,* 123 Ga. 146 (51 SE 374) (1905); *Daniel v. State,* 103 Ga. 202, 209 (29 SE 767) (1897); *Coxwell v. State,* 66 Ga. 309 (1880); *Shaw v. State,* 60 Ga. 246 (1878); *Monroe v. State,* 5 Ga. 85 (1848); *Anderson v. State,* 138 Ga. App. 871 (1) (227 SE2d 783) (1976); *Mitchell v. State,* 134 Ga. App. 376, 378 (214 SE2d 593) (1975).

There was abundant evidence that the difficulties between Tommy and Gail Gunter, and Betty Parsons, over child support for Shane Gunter, persisted until the time Betty Parsons was killed in August of 1977. The trial court did not err in admitting in evidence the records of the divorce and contempt proceedings.

4. In Gail's third and fourth enumerations of error and Tommy's fourth and fifth enumerations of error, they argue that the trial court erred in admitting in evidence state's Exhibits 42-48 as standards of handwriting which were compared with state's Exhibits 49-51, since the handwritings contained in state's Exhibits 42-48 were not authenticated in accordance with the requirements of Code §§ 38-708 and 38-709.

State's Exhibit 42 is a note, dated February 28, 1978, on which the following message is written: "Don't call my home no more Bitch." State's Exhibit 43 is another note of

the same date, which contains this message: "You Better tell Shane, Santa Claus won't be coming here any more and Don't call my home no more not for *Anything.* This child support is for Shane and not for you and Gary to Live off of. I think he should have a *Big* Christmas with $275.00 a month." State's Exhibits 44, 45, 47 and 48 are envelopes containing child support payments for Shane Gunter. (Both Tommy and Gail Gunter's names appear as addressees on the envelopes.) State's Exhibit 46 is a child support check for Shane Gunter, signed by Tommy Gunter. As shown on the face of the check, the checking account is in the name of Tommy or Gail Gunter. As further shown on the face of the check, the check was not paid by the bank because the signature on the check does not correspond with the signature on the checking account signature card. State's Exhibits 49-51 are photographs of the victim's house, showing obscenities written thereon.

A writing, alleged to be in the handwriting or signature of a party, is inadmissible unless the writing is proved or acknowledged to be genuine. Code §§ 38-708, 38-709. See *Smith v. Hatgimisios,* 233 Ga. 354 (211 SE2d 306) (1974); *Burgess v. Simmons,* 207 Ga. 291, 296 (61 SE2d 410) (1950); *Manning v. Carroll,* 206 Ga. 158 (56 SE2d 278) (1949); *Burden v. State,* 147 Ga. 412 (94 SE 232) (1917); *Kent & Downs v. Wadley Southern R. Co.,* 136 Ga. 857 (72 SE 413) (1911). The genuineness of the writing, however, may be proved by circumstantial evidence. *Deaderick v. Deaderick,* 182 Ga. 96 (185 SE 89) (1935); *Fay v. Burton,* 147 Ga. 648 (95 SE 224) (1917). Here, the foundation was laid by Gary Parsons, the victim's husband, who testified that the items in question were all either envelopes in which child support payments for the victim's son had arrived, or a check for child support which was in one of the envelopes, or notes also included in some of the envelopes. He did not testify that he would recognize the writing of either defendant, but he did testify that he saw his wife open each communication in question, and that child support payments in envelopes with such notes had come irregularly, but frequently, over a period of time. The checking account was a joint account of Tommy and Gail. When asked who signed the

checks, Parsons twice said that Gail did. Once this testimony was objected to on grounds he had no knowledge of it, but no ruling was made and the answer was not stricken. Another time, the witness said, "Gail did, I think." The handwriting expert testified that the same person wrote all of Exhibits 42-48, but he never said who, nor was he asked. The only indication of who he thought did it was once he referred to the way "she" wrote. Under the rulings in *Smith v. Hatgimisios,* supra, *Cotton States Mut. Ins. Co. v. Clark,* 114 Ga. App. 439 (151 SE2d 780) (1966), and *Fidelity & Cas. Co. of N. Y. v. Mangum,* 102 Ga. App. 311 (116 SE2d 326) (1960), this circumstantial evidence meets the any evidence standard in reviewing the trial court's decision.

5. In Gail's fifth enumeration of error and Tommy's sixth enumeration of error, it is also argued that the trial court erred in admitting state's Exhibits 42-51 in that the state refused to submit these documents to the defense prior to trial in violation of Code § 38-709.

We agree that the state's refusal to submit these documents to the defense prior to trial was in violation of Code § 38-709. See *Ginn v. Ginn,* 142 Ga. 420 (2) (83 SE 118) (1914); *Moultrie Repair Co. v. Hill,* 120 Ga. 730, 734 (48 SE 143) (1904); *Henderson v. State,* 145 Ga. App. 597, 600 (244 SE2d 136) (1978); *Smith v. State,* 138 Ga. App. 226 (4) (225 SE2d 744) (1976). However, we are unable to agree that the erroneous admission of state's Exhibits 42-51 constitutes reversible error. These documents contained evidence of threats against the victim by both of the appellants. Since evidence of such threats was competently admitted in other parts of the trial through the testimony of other witnesses, evidence of these threats were merely cumulative. Consequently, we hold that the erroneous admission of state's Exhibits 42-51 was harmless error.

6. In Gail's sixth enumeration of error and Tommy's eighth enumeration of error, they argue that the trial court erred in refusing to charge the jury on the laws of conspiracy, since hearsay testimony of Whitehead was admitted under a co-conspiracy exception to the hearsay rule (Code Ann. § 38-306) and since it, therefore, became a matter for the jury to determine whether the hearsay

testimony was admissible by reason of the fact that a conspiracy had been proved.

Code Ann. § 38-306 provides that, "after the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." See Division 7, infra.

It has been held that, "In order properly to admit the declaration of an alleged co-conspirator made during a criminal project, there must be sufficient evidence aliunde the declaration to establish the conspiracy at least prima facie and prove its existence beyond a reasonable doubt. But the trial judge having a sound discretion as to the order of proof, 'if a prima facie case of conspiracy is shown from the whole evidence, the admitting of such (a declaration) is not error . . . If sufficient prima facie evidence . . . is introduced to authorize the admitting of evidence of acts and declarations of one of the alleged conspirators, ultimately it is for the jury to determine whether, from the whole evidence, a conspiracy has been shown' beyond a reasonable doubt; and if they thus find that none has been established, it is then their duty not to consider the testimony of acts and declarations of the supposed co-conspirator which has been admitted. [Cits.]" *Wortham v. State,* 184 Ga. 674, 680 (192 SE 720) (1937). Accord, e.g., *Knight v. State,* 239 Ga. 594 (238 SE2d 390) (1977); *Coleman v. State,* 141 Ga. 731 (82 SE 228) (1914).

In the present case, there was sufficient prima facie evidence of a conspiracy to allow admission of the hearsay testimony of Whitehead concerning declarations made by the other conspirators during the pendency of the criminal project. However, it was for the jury to determine whether the conspiracy was proved beyond a reasonable doubt, and, thus, whether the hearsay testimony of Whitehead was admissible against Tommy and Gail Gunter. Accordingly, the trial court should have charged the jury on the laws of conspiracy.

However, we hold that the judgment need not be reversed on this ground. The appellants primarily requested a charge on the law of conspiracy as a lesser

included offense of murder. The trial court did not err in refusing to give such a charge. Although it may be that conspiracy as defined in Code Ann. § 26-3201 is a lesser included offense in an indictment charging the commission of the crime, where the evidence shows without dispute that the crime charged was actually committed, the omission to charge on conspiracy is not error. *Dutton v. State,* 228 Ga. 850 (3) (188 SE2d 794) (1972). The failure to charge on conspiracy under these circumstances is not error, because, if the crime has in fact been committed, the co-conspirators are guilty as parties to the commission of the crime under Code Ann. § 26-801. *Scott v. State,* 229 Ga. 541 (1) (192 SE2d 367) (1972). The trial court did charge the jury on parties to the commission of a crime under Code § 26-801.

7. In Gail's seventh enumeration of error and Tommy's ninth enumeration of error, the appellants argue that the trial court erred in allowing Wayne Self to testify that, shortly after Betty Parsons had been killed, Jimmy O'Dillon told Self that he had committed the murder.

The course of events is as follows: The murder of Betty Parsons took place between 10 p.m. and 11:30 p.m. on August 12, 1977, at her home in Beech Creek Estates, Winder, Georgia. Whitehead and O'Dillon then returned the gun O'Dillon used to commit the killing, and they drove to the Dairy Queen in Watkinsville, Georgia. It was at the Dairy Queen that the conversation between O'Dillon and Self took place. Self testified that he had asked O'Dillon, "Did you all do it?" Self further testified that, "Jimmy looked at me and said, 'yes.'" This conversation occurred at approximately 1 a.m. on August 13, 1977. O'Dillon and Whitehead then returned to their trailer in Jackson County, Georgia, where they were arrested that evening. Whitehead gave a statement to police, incriminating O'Dillon and Tommy and Gail Gunter, at approximately 6 a.m. on August 13, 1977. Also, Whitehead testified as to a conversation taking place between himself, O'Dillon and Gail Gunter, approximately one week after he had been arrested, in which they talked about "everybody keeping quiet."

The state argues, and the trial court found, that the foregoing testimony was admissible in this case under Code § 38-306, supra. The appellants, on the other hand, argue that the hearsay testimony was inadmissible in this case under a limitation of Code § 38-306 found in Code § 38-414: "The confession of one joint offender or conspirator, made after the enterprise is ended, shall be admissible only against himself."

The two previously cited Code sections are mutually exclusive. *Crowder v. State,* 237 Ga. 141 (227 SE2d 230) (1976). That is, an incriminatory declaration made by one conspirator is either made "during the pendency of the criminal project," and is thus admissible against the other conspirators under Code § 38-306, or it is made "after the enterprise is ended," and is thus inadmissible against the other conspirators under Code § 38-414. *Crowder v. State,* supra; *Hill v. State,* 232 Ga. 800 (1) (209 SE2d 153) (1974). In this state, the criminal project is still pending so long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues. *Knight v. State,* supra; *Reed v. State,* 238 Ga. 457 (6) (233 SE2d 369) (1977); *Evans v. State,* 222 Ga. 392, 402 (150 SE2d 240) (1966), affirmed sub nom Dutton v. Evans, 400 U. S. 74 (91 SC 210, 27 LE2d 213) (1970); *Chatterton v. State,* 221 Ga. 424 (5) (144 SE2d 726) (1965). However, it has been held that statements made by a conspirator to the police after the conspirator's arrest, which statements incriminate another conspirator, terminate the conspiracy and are, therefore, inadmissible against the other conspirators under Code § 38-414. *Crowder v. State,* supra; *Munsford v. State,* 235 Ga. 38, 43 (218 SE2d 792) (1975).

It is, therefore, apparent that Whitehead's confession to the police on August 13, incriminating the other conspirators, terminated Whitehead's participation in the conspiracy. This does not, however, provide an answer to the question of whether the conspiracy was still pending when, prior to O'Dillon's and Whitehead's apprehension by the police, O'Dillon admitted to Self that he had done the killing.

The appellants argue that the conspiracy ended when O'Dillon and Self returned the murder weapon to its

owner. They maintain that, if the state desired to show that the conspiracy was still pending after this occurred, it was necessary for the state to prove its continuing character by evidence of acts of concealment on the part of the conspirators.

The evidence showed that, at least one week after O'Dillon's and Whitehead's arrest, O'Dillon, Whitehead, and Gail Gunter were still talking about "everybody keeping quiet," and O'Dillon and Gail Gunter were in fact keeping quiet. Thus, we find evidence that O'Dillon and Gail Gunter continued to conspire to conceal the crime for at least one week after O'Dillon's admission to Self. O'Dillon's admission to Self was, therefore, admissible against the appellants under Code Ann. § 38-306 as a declaration of a co-conspirator during the pendency of the criminal project. We find these enumerations of error to be without merit.

8. In Gail's tenth enumeration of error and Tommy's twelfth enumeration of error, they argue that the trial court erred in allowing in evidence, over objection, certain testimony of David Wages, who was the attorney representing Betty Parsons in her contempt action against Tommy Gunter for nonpayment of child support. Wages was permitted to testify that Betty Parsons had told him after the contempt hearing that, "Something bad is going to happen because of this. They are going to kill me because of this." Wages also testified that Betty Parsons had told him at that time that Gail Gunter had told her that, "We're gonna get your ass."

The appellants objected to introduction of this testimony on the ground of hearsay. We agree, but, for the reasons stated in Division 5, supra, we hold that the erroneous admission of this hearsay testimony was harmless error.

We have reviewed the remaining enumerations of error and find them all to be without merit.

*Judgment affirmed. All the Justices concur, except Hill, J., who dissents as to Divisions 5, 6 and 8 and Bowles and Marshall, JJ., who dissent as to Divisions 5 and 8.*

ARGUED MARCH 14, 1979 — DECIDED MAY 9, 1979 —

REHEARING DENIED MAY 31, 1979.

*Fortson, Bentley & Griffin, Herbert T. Hutto,* for appellant (Case No. 34611).

*Alan M. Alexander, Jr.,* for appellant (Case No. 34612).

*Nat Hancock, District Attorney, Richard J. Burkett, Assistant District Attorney, Arthur K. Bolton, Attorney General, Susan V. Boleyn, Assistant Attorney General,* for appellee.

MARSHALL, Justice, dissenting.

I must dissent to the majority's indiscriminate application of the harmless error rule in this case.

This is a murder prosecution against a husband and wife, Tommy and Gail Gunter, for murdering the husband's ex-wife, Betty Parsons. The evidence in the case consists almost exclusively of the testimony of an accomplice. The totality of the evidence does cast on the defendants a grave suspicion of guilt. However, the evidence that can be considered corroborative of the accomplice's testimony must be viewed as slight. In fact, the corroborating evidence consists almost exclusively of evidence of prior threats by the defendants against the victim due to their annoyance at the husband's having to pay child support to the victim after she had remarried. Evidence of these threats came through the testimony of five witnesses, three of whom testified to threats by Tommy only, one of whom testified to threats by Tommy and Gail, and one of whom testified to threats by Gail only. In addition, there was some documentary evidence (state's Exhibits 42-51) of these threats. A majority of this court concludes that the erroneous admission of all of the documentary evidence (Division 5) and the erroneous admission of the hearsay testimony of the witness testifying to the threats by Gail (Division 8) was harmless error in view of the testimony of the other witnesses. This takes the harmless error doctrine too far for me.

It requires a liberal application of the corroboration requirement of Code § 38-121 to even find that there was adequate corroboration of the accomplice's testimony,

which, in itself and independently of the testimony of the accomplice, directly connects the defendants with the crimes and leads to the inference that they are guilty. E.g., *Reaves v. State,* 242 Ga. 542 (250 SE2d 376) (1978) and cits. Once it is determined in Divisions 5 and 8 that the evidence there should not have been admitted, the corroboration as to Gail is practically nonexistent. I cannot see how the majority concludes that the errors were harmless. I respectfully dissent.

I am authorized to state that Justice Hill and Justice Bowles join in this dissent.