## 62847. GROSS v. THE STATE.

BIRDSONG, Judge.

The appellant Tommy Wesley Gross was convicted of kidnapping for ransom and sentenced to life imprisonment. *Held:*

1. The trial court did not err in admitting in evidence two notebooks, representing handwriting samples, for comparison with the kidnapping ransom note, and in refusing to strike the testimony of the state's expert witness as to comparison of these notebooks with the ransom note. Code Ann. § 38-709 provides: "Other writings, proved or acknowledged to be genuine, may be admitted in evidence for the purpose of comparison by the jury. . . ." The Georgia Supreme

Court in *Gunter v. State,* 243 Ga. 651, 657-658 (256 SE2d 341) held, "A writing, alleged to be in the handwriting or signature of a party, is inadmissible unless the writing is proved or acknowledged to be genuine. [Cits.] The genuineness of the writing, however, may be proved by circumstantial evidence. [Cits.]" The state's handwriting expert in this case testified that, although as many as three persons had written in the books, some of the hand printing in the two notebooks found on appellant's premises (where he lived alone) was prepared by the person who wrote the ransom note, but that he could not say that particular sample of handwriting was by the appellant because it was in printing and he had no independent hand printing of the appellant for comparison. The appellant admitted that the notebooks were his and that some of the writing in the books was his.

This evidence constituted circumstantial evidence, which, although not in itself conclusive that the appellant wrote the ransom note and hence not admissible under Code Ann. § 38-708, was admissible merely on the basis that notebooks belonging to the appellant, written in by the appellant and found on his premises, contained writing by the person who wrote the ransom note, this being an admissible fact for consideration by the jury with the other evidence in the case pointing to the appellant's guilt of the kidnapping. Direct evidence of guilt is not always available (see Code Ann. §§ 38-708, 38-709), and it is for this reason that our courts admit circumstantial evidence "which only tends to establish the issue by proof of various facts, sustaining by their consistency the hypothesis claimed." Code Ann. § 38-102. The jury was entitled to consider the significance of this evidence in the context of the other evidence in the case, although it did not by itself prove that the appellant wrote the ransom note.

2. Appellant's enumerations of error regarding the trial court's ruling on his motion for discovery are without merit. In *Barnes v. State,* 157 Ga. App. 582, 586 (277 SE2d 916), we held that on appeal, "inasmuch as Brady violations involve the discovery, after trial (or during trial) of suppressed material . . . if the appellant, post trial, can point to nothing materially exculpatory which was suppressed, he has no right under the Brady principle." In *Barnes,* supra, pp. 587-588, we established that, according to the standards set forth by the United States Supreme Court in U. S. v. Agurs, 427 U.S. 97, 104-112 (96 SC 2392, 49 LE2d 342), an appellant on appeal must show that exculpatory evidence was suppressed which was material. See also *Rini v. State,* 235 Ga. 60 (218 SE2d 811). The appellant Gross in this case contends he was entitled to review the statements of the principal state's witnesses (e. g., Bullrat Collins). The trial judge stated that he had examined the requested evidence and found

nothing materially exculpatory in it. The appellant Gross sets forth nothing in the way of showing that any materially exculpatory evidence in these statements was suppressed; he therefore cannot show constitutional error in the trial court's refusal to give appellant access to these statements. *Barnes,* supra. Absent a prima facie showing that materially exculpatory evidence is contained therein, the appellant is not entitled to a fishing expedition in the state's files, including the statements of witnesses. See *Barnes,* supra, p. 586. Where the Supreme Court held in *Rini v. State,* supra, that the trial court erred in its denial of Rini's post trial request for production of statements of state's witnesses, it was on the prima facie grounds shown by the appellant that during the trial he discovered that certain material exculpatory evidence was suppressed which might have affected the outcome of the trial. See *Barnes,* supra, p. 587.

The appellant contends he was wrongly denied access to "all papers, documents, photographs, tangible objects or portions thereof, in the possession, custody or control of the state." He evidently did have access to the hand printing samples used by the state and could have subpoenaed Gary Anderson's telephone records on his own, and otherwise has not shown that any materially exculpatory evidence was suppressed or that he was prejudiced thereby. *Barnes,* supra. Appellant, moreover, was not entitled to have the state produce the criminal records of the proposed witnesses, absent a showing that such evidence was competent evidence and materially exculpatory to him and that, moreover, he did not have access to such information by his own efforts. Appellant was not entitled to the production of "negative" evidence, absent the requisite showing of materiality and exculpation; moreover, the transcript indicates that the "negative" evidence specifically sought by the appellant was in fact not suppressed but was known to him. Absent the requisite showing of suppression of materially exculpatory evidence, the appellant was not entitled to discover the names, addresses and statements of all witnesses investigated by the state in an effort to support Bullrat Collins' testimony, nor to have copies of all photographs displaying firearms, ski masks and clothing exhibited to the victim's mother Mrs. Mobley, nor to have the results of scientific investigations or physical examinations not supporting the state's case against the appellant's.

3. Appellant contends the trial court erred in denying his motion to suppress. The evidence shows that the deputy sheriff in this case, upon instruction from the GBI to locate the appellant, stopped appellant Gross and told him the GBI wanted to talk to him; that the appellant suggested they go back to his house and the deputy went with him and was invited inside; that appellant said he was tired

of being followed and harassed but would talk to the GBI one more time and then engaged in some "chit-chat" and brought out his guns (none of which, apparently, was a .45 or M-16 or AR-15, the gun types identified by Mrs. Mobley as being used by the kidnappers) and showed them to the deputy. A few minutes later, after receiving a phone call from the GBI who had determined that the deputy had gone back to appellant's house, the deputy placed appellant under arrest and went outside the house to wait for the GBI. These circumstances do not constitute an illegal intrusion tainting the subsequent search. The affidavit supporting the search warrant was not lacking in probable cause. The supporting affidavit recited detailed information given by Rusty Mallard, Bullrat Collins and Joe Delguidice. This information described the numerous prior conversations between Rusty Mallard and appellant concerning the kidnapping and the details and facts discussed in these conversations, that Delguidice had seen a .45 caliber handgun at Gross' house within two weeks of the kidnapping and Mallard had seen a submachine-type gun and automatic pistol there within the previous six months; that Bullrat Collins had made a certain ransom phone call at appellant's direction on Friday night about midnight after the kidnapping, from the residence of Gary Anderson. The affidavit included the signed statement of Rusty Mallard. The magistrate asked the affiant GBI agent whether there was a ransom telephone call received by the Mobleys on Friday night, and was informed that there was. The affidavit did not state that the informants were reliable and credible, but the detailed, mutually corroborative information given by these three named individuals, particularly with the independent corroboration obtained by the magistrate, verifies the probable credibility of the information and the present probable credibility of the informants themselves, and is sufficient to establish probable cause. *Shaner v. State,* 153 Ga. App. 694, 699 (266 SE2d 338).

4. Appellant presents no evidence in the record to support his contention that the trial court erred in denying his motion to strike the indictment and his special plea in abatement. The trial court did not err in allowing the state to question appellant concerning his dealings with marijuana, inasmuch as the appellant first introduced this subject matter and, in fact, repeatedly relied upon it as explanation for his activities. The trial court did not err in refusing to allow into evidence the written transcript of Mrs. Mobley's preliminary hearing testimony, and in any case appellant's counsel thoroughly cross examined her on this material. The trial court did not err in refusing to allow appellant to use, as an evidentiary exhibit in trial and in cross examination of Mrs. Mobley, a photographic

display of various firearms, based on the judge's discretionary determination that the photographs were not relatively depictive or clearly distinguishable. We do not find that the appellant was prevented from cross examining Mrs. Mobley on her ability to identify firearms. Finally, the trial court did not err in refusing in evidence a schedule or calendar of events which appellant's counsel had witnesses fill in during the course of their testimony.

5. The evidence showed that about 7:35 a. m. on Thursday, August 7, two persons forced their way into the Mobley home near Sylvania, Georgia, abducted the two-year-old Mobley son, and left a ransom note demanding $225,000. Mrs. Mobley testified at trial that one of the kidnappers wore a striped ski mask, and at trial identified the other kidnapper as appellant Tommy Gross. Investigators found fresh motorcycle tracks and footprints in the woods near the Mobley residence; it was shown that Tommy Gross owned a motorcycle. The two kidnappers carried guns which Mrs. Mobley later identified from photographic "lineups" as a .45 automatic handgun and an M-16 rifle (which looks like an AR-15); evidence showed that Tommy Gross apparently collected guns and bought and traded guns among his friends, and in recent years had purchased a .45 and an M-16 or AR-15 from his friends. Shells of a .223 caliber which are capable of being fired from an M-16 or AR-15 were found behind Gross' house, along with other kinds of shells, at a makeshift shooting range where he and his friends shot targets. A photograph of Gross wearing what appeared to be a wool ski cap or hat with rolled-up brim was found in his house, which photograph Mrs. Mobley identified as depicting colors and stripes similar to those of the ski mask worn by the kidnapper not identified as Gross. Within a few days after the kidnapping, one Rusty Mallard, a friend of the appellant, apparently contacted the police and related how several months earlier he, appellant Gross and another friend, Gary Watson, had been sitting around discussing ways to make money and discussed the possibility of robbing a bank or of kidnapping Mobley's young son. The facts were discussed that Mobley could pay a quarter of a million dollars, left his home every morning about 7:30, and had a two-year-old son who was too young to talk. The kidnapping idea had been Rusty Mallard's and he had provided the details, but he claimed it was not a "serious" conversation. A couple of months later in February the same conversation was reenacted, but Mallard and Watson both claimed at trial they had not been serious. Rusty Mallard testified that in about March appellant Gross asked him if he had thought any more about it; Mallard said no. Bullrat Collins testified that on Friday night (after the kidnapping on Thursday morning), appellant Gross told him about the kidnapping and asked him to make the

ransom call to Mr. Mobley, apparently on the basis that Bullrat owed Gross $1,500 and if Bullrat made the call the debt would be forgiven. According to Bullrat, appellant Gross told him that his partner in crime Cleve Brant was getting nervous because a black man had seen them by a bridge and a woman jogger had seen them. (A black man on a bridge did see appellant and another person in a truck below the bridge; a woman did jog by the Mobleys' house early Thursday morning.) According to Bullrat, he and Gross then drove to the residence of Gary Anderson who was away. On the way, Gross stopped and made a telephone call from the pay phone in front of the Statesboro City Hall, which Gross explained to Bullrat as a call to Cleve Brant checking up on the kid. At Gary Anderson's house, Bullrat and appellant Gross sat at the kitchen table and Gross tried to convince Bullrat to make the call, until finally Anderson and Angie Sandlain unexpectedly returned. Within about five minutes of Anderson's and Angie's entrance, Bullrat made the ransom call from a phone in the bedroom, reading from a ransom message written on a napkin by appellant Gross while Gross listened in on the kitchen phone. According to Bullrat, the next day he told appellant Gross to let the child go or he would tell the police. On Monday, he did go to the police. Gary Anderson and Angie Sandlain testified that after they returned to their home on Friday night, they saw Bullrat go to the bedroom and make a call, and saw appellant Gross listen in on the kitchen phone. (A ransom call to Mr. Mobley was made at 11:54 p. m.) Angie Sandlain also testified that Gross had visited her and Anderson on Thursday night and she had asked him to spend the night rather than ride back to Sylvania because he had been drinking, whereas Gross mentioned that he had to go home as he had to answer his girlfriend's daily wake-up call the next morning because he had not been there that (Thursday) morning. Appellant Gross testified that he had met Bullrat at the Hops night spot on Friday night, that he had made a call from the Statesboro City Hall pay phone to Cleve Brant at Gross' home in Bullrat's presence but the call had nothing to do with a kidnapping, that he and Bullrat had then gone to Anderson's house and that he had asked Bullrat to call a guy who owed him (Gross) money and had listened in on the call, but Gross denied any knowledge of the kidnapping or that the call was a ransom call to Mr. Mobley. The state produced documentary evidence and operator testimony showing that a collect call was made from the Statesboro City Hall pay phone by "Tommy" to Tommy Gross' telephone in Sylvania.

Appellant Gross' girlfriend testified that she talked to Gross Thursday morning about 7:30 when she called to wake him up, but she had made an earlier statement to the GBI in which she had said

Gross had not answered the phone. Several Sylvania citizens testified they saw appellant in town and at work between 8:10 and 8:15 a. m. The kidnappers arrived at the Mobley house after or about 7:35 and the Mobley's car, which the kidnappers took, was seen driving away from the Mobley house at 7:55 a. m. Appellant Gross attempted to account for his activities from Thursday morning to Sunday evening when the child was found naked in the woods (and apparently bitten by insects), so as to show that he could not have been caring for a child, but a local storekeeper testified Gross bought gas from her when he claimed he had been at home sleeping and also said that at another time he bought candy and several "suckers" from her and more milk than usual. There was also testimony by GBI agents who said they were attacked by fleas while searching Gross' house. The state showed that two small spiral notebooks containing handwriting identical to the handwriting in the ransom note, were found on appellant's premises; appellant admitted these notebooks were his and that he had written in them.

After reviewing this evidence, we find that a reasonable trier of fact could rationally have found from that evidence proof of guilt beyond a reasonable doubt. *Boyd v. State,* 244 Ga. 130, 132 (259 SE2d 71); *Turner v. State,* 151 Ga. App. 169, 170 (259 SE2d 171). The trial court did not err in denying appellant's motion for new trial upon the grounds stated.

*Judgment affirmed. Sognier, J., concurs. Shulman, P. J., concurs in the judgment only.*

DECIDED MARCH 3, 1982—

*B. C. Baxter, Jr., John B. Long,* for appellant.
*J. Lane Johnston, District Attorney,* for appellee.