S97A0835. FETTY v. THE STATE.
(489 SE2d 813)

SEARS, Justice.

Appellant Jason Fetty alleges that numerous purported instances of error concerning the procedural and evidentiary aspects of his criminal trial mandate the reversal of his convictions for malice murder, aggravated assault, and burglary. Upon review of the record, we find that the trial court erred by failing to merge Fetty's conviction for aggravated assault with his conviction for malice murder, and thus the conviction and sentence for the assault must be set aside as a matter of law. We need not decide whether the trial court erred by admitting certain hearsay testimony propounded by a State's witness, as any conceivable error associated with such admission was entirely harmless. Finding no merit associated with Fetty's other enumerations, we affirm and vacate in part.

The facts introduced at trial show that Fetty and Amanda McCraig were teenage lovers. Following the last in a series of arguments between the couple, Amanda ended the relationship. Thereafter, Fetty issued several threats against Amanda and continually harassed her. On February 14, 1995, Fetty and his co-defendant Carper drove to the home where Amanda lived with her mother. Seeing that Amanda was alone at the residence, they rang the front doorbell. When Amanda refused to speak with him, Fetty became enraged and went to the back of the house, where he kicked the door in, entered the home, and shot and killed Amanda. He then fled in Carper's automobile to Florida, where he led police officers on a high-

speed chase before being apprehended. The murder weapon was recovered from the automobile Fetty was driving at the time of his arrest.[1]

1. Having reviewed the record, we conclude that the evidence introduced at trial, construed most favorably to the verdict, was sufficient to enable a rational trier of fact to find beyond any reasonable doubt that Fetty was guilty of the crimes for which he was convicted.[2]

2. If, in establishing the commission of a crime, the State relies entirely upon the same evidence used to establish a separate crime charged in the same indictment, as a matter of law the former charge is included in the latter charge.[3] As alleged in the indictment, the charges against Fetty for malice murder and aggravated assault both stem from his having shot and killed Amanda. In this situation, an independent aggravated assault is shown only if supported by evidence that was not shown to establish the murder.[4] Because the evidence in this case does not support a conviction for aggravated assault that is independent of the acts that caused Amanda's death, the conviction and sentence for the aggravated assault of Amanda must be set aside as a matter of law.[5]

3. Fetty claims that the trial court erred by admitting into evidence a tape recording of a telephone conversation between him and a friend of Amanda's made several days before the murder, in which he admitted having gone to Amanda's house with a gun, intending to kill her. The recording was made independently by the friend with whom Fetty had the conversation, and was turned over to the police after Amanda's murder.

OCGA § 16-11-62 prohibits the clandestine intentional recording of another's private phone conversations. However, it is established that § 16-11-62 does not apply to one who is a party to such conversations,[6] and thus it is inapplicable to this case.

OCGA § 16-11-66 (b) provides that after the proper consent is obtained by judicial order, a telephone conversation to which a minor is a party may be recorded and divulged by a citizen, prosecutor, or

---

[1] The murder took place on February 14, 1995, and Fetty was indicted on March 7, 1996, for malice murder, felony murder, aggravated assault, and burglary. The trial was held on October 14-22, 1996, and Fetty was found guilty of malice murder, aggravated assault, and burglary. He was sentenced to life in prison for the murder conviction, and two consecutive 20-year sentences on the aggravated assault and burglary convictions. Fetty timely filed his notice of appeal on November 13, 1996. The transcript was certified by the court reporter on February 26, 1997, the appeal was docketed with this Court on March 3, 1997, and the matter was orally argued before the court on June 16, 1997.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] OCGA § 16-1-6 (1); *Jordan v. State*, 267 Ga. 442, 447 (480 SE2d 18) (1997).

[4] *Jordan*, supra.

[5] Id.; *Montes v. State*, 262 Ga. 473, 474 (421 SE2d 710) (1992).

[6] *State v. Birge*, 240 Ga. 501 (241 SE2d 213) (1978).

law enforcement officer, but that such a recording cannot be used "in any prosecution of the consenting child." Because he was a minor when the recording was made, and the recording was made without his consent or the approval of a judge, Fetty claims that it was improperly used against him at trial in violation of the statute. However, we have held that § 16-11-66 applies only to a third party's interception of telephone conversations and does not prohibit the actual parties to such conversations from recording and divulging them.[7] Hence, § 16-11-66 (b) also is inapplicable, and this enumeration is rejected.

4. Fetty claims that the trial court erred by admitting several hearsay statements under the necessity exception to the rule prohibiting hearsay evidence. The first of these hearsay statements was recounted by Amanda's mother, who testified about a conversation she held with Amanda on the day before the murder, in which Amanda told her mother that Fetty had threatened to kill her. Fetty claims that the trial court erred by admitting that hearsay testimony.

OCGA § 24-3-1 (b) permits the admission of hearsay evidence in "specified cases from necessity," so long as (1) the declarant is unavailable, and (2) there is a circumstantial guarantee of trustworthiness inherent in the statement.[8] This exception to the rule against hearsay, like others, is intended to accommodate situations where " 'a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed.' "[9] Here, we will look to the totality of the circumstances surrounding the making of Amanda's hearsay statement to her mother in order to determine whether it was characterized by sufficient evidence of trustworthiness to make it admissible under the necessity exception.[10]

While testifying, Amanda's mother conceded that, in the period of time preceding the subject conversation, her relationship with Amanda was quite strained. Amanda had been forbidden by her mother from seeing Fetty, yet she nonetheless was continuing the relationship without her mother's knowledge. Amanda recently had suffered the loss of her father to illness and habitually isolated herself from her mother and her family. Several months before the murder, Amanda's mother had committed her against her will to a residential counseling center, in part to relieve tensions in their mother-daughter relationship. On the other hand, Amanda's mother also testified that in the weeks preceding the murder, she and Amanda had

---

[7] *Mitchell v. State*, 239 Ga. 3, 4-5 (235 SE2d 509) (1977) (concerning the predecessor to § 16-11-66, Ga. Code Ann. § 26-3006).

[8] *Dix v. State*, 267 Ga. 429, 430 (479 SE2d 739) (1997).

[9] *Dix*, 267 Ga. at 431 (citation omitted).

[10] See *Roper v. State*, 263 Ga. 201, 202 (429 SE2d 668) (1993).

attended group therapy sessions that had greatly improved their relationship. Despite the improved status of their relationship, however, Amanda's mother testified that at the time of the subject conversation, it was entirely possible Amanda was "doing things behind [her mother's] back," and against her wishes, especially with regard to Amanda's relationship with Fetty.

In light of these circumstances, Fetty urges that there was insufficient indicia of reliability associated with Amanda's hearsay statement to her mother to warrant its admission into evidence under the necessity exception. We need not, however, make that determination, because the admission of the hearsay testimony, even if it was erroneous, was altogether harmless, as the substance of the testimony was duplicated by other evidence that was properly introduced, including Fetty's handwritten threats against Amanda's life.[11]

For this same reason, we reject Fetty's argument that the trial court erred by admitting Amanda's hearsay statements, made on the day of the murder and recounted by her high school guidance counselor, that Fetty had been harassing, stalking, and threatening her. Amanda had spoken to the guidance counselor at the behest of both her mother and law enforcement officers who had been contacted about Fetty's harassment of Amanda. Fetty contends that the hearsay statements made to the counselor lacked sufficient indicia of reliability to warrant their admission, and therefore should have been excluded. Pretermitting that argument, the substance of the counselor's hearsay testimony was duplicated in its entirety by other evidence that was properly introduced, and thus admission of the hearsay, even if it was erroneous, could not have been harmful.[12]

We also reject Fetty's contention that the trial court erred by admitting the hearsay testimony of Amanda's close friend, Ms. Bonds, with whom Amanda was speaking on the telephone immediately before Fetty killed her. Ms. Bonds testified that Amanda told her that, as they were speaking on the telephone, Fetty was standing outside the front door and would not leave Amanda alone, and that she had put some of his things on the front porch and shut the door in his face. Within minutes of making this statement, Amanda was killed. Ms. Bonds and Amanda were close confidants,[13] and Amanda's statements to Ms. Bonds were made immediately before the assault and murder took place, and were not disavowed.[14] Thus, there was sufficient indicia of reliability to warrant the admission of Ms. Bond's hearsay testimony.

---

[11] See *Dix*, 267 Ga. at 431.

[12] Id.

[13] *Roper*, supra.

[14] See *Higgs v. State*, 256 Ga. 606, 608 (351 SE2d 448) (1987).

5. Fetty insists that the trial court erred by admitting evidence of several prior difficulties between him and Amanda. Following a hearing held pursuant to Uniform Superior Court Rule 31.3 (B), evidence was admitted that ten days before the murder, Fetty and Amanda had fought, and that he had locked her in a motel bathroom and refused to let her out. Evidence also was admitted to show that, after the motel incident, while in Amanda's presence, Fetty pointed a gun at a male friend of Amanda's who had warned him to stop following Amanda. Finally, evidence was introduced that approximately one week before the murder, Fetty had publicly confronted Amanda and verbally threatened her. Fetty claims that this evidence was both prejudicial and irrelevant, and improperly placed his character before the jury.

With respect to each prior difficulty sought to be introduced, the State was required to show that: (1) there was sufficient evidence that it occurred; (2) the evidence was offered for an appropriate purpose; and (3) there was a sufficient probative connection between the prior difficulty and the assault and murder of Amanda to justify the former's admission.[15] We agree with the trial court that the State satisfied these burdens. First, the evidence clearly showed that these incidents occurred. Second, the evidence was admitted for a proper purpose, as it showed Fetty's bent of mind and pattern of behavior in harassing, stalking, and threatening Amanda.[16] Finally, there was a probative connection between each of these incidents and the crimes charged. The incident where Fetty fought with Amanda and locked her in the bathroom precipitated her decision to break off the couple's relationship and was the beginning of Fetty's stalking and harassment of Amanda. That pattern of behavior culminated in Amanda's murder. The incident where Fetty pointed a gun at Amanda's male friend was a continuation of that behavior pattern, as was the incident where Fetty publicly confronted and threatened Amanda. Thus, the trial court did not err in admitting the prior incidents, and this enumeration is rejected.

6. The trial court excluded from evidence portions of Amanda's personal daily journal sought to be introduced by Fetty. The State's case against Fetty was based upon its theory that after Amanda ended the relationship on February 4, 1995, Fetty harassed, stalked, and eventually killed her. In order to rebut the State's characterization of his relationship with Amanda, Fetty sought to introduce entries from Amanda's journal that were made before February 4, 1995. Many of those journal entries were in letter form addressed to

---

[15] *Stewart v. State*, 266 Ga. 1, 1-2 (463 SE2d 493) (1995).
[16] Id.; *Williams v. State*, 261 Ga. 640, 642, n. 2 (409 SE2d 649) (1991).

Fetty, and all of the entries concerned the state of the couple's relationship before February 4, 1995. Even though it is undisputed that as of February 4, 1995, that relationship changed dramatically, we disagree with the State's assertion to the trial court that the journal entries made before February 4 were too remote to be relevant to the crimes charged. Most of the journal entries were made in the weeks immediately preceding the murder, and, had they been admitted into evidence, could have "elucidate[d] or . . . throw[n] light upon"[17] the change that occurred in the couple's relationship on February 4, 1995, and what followed thereafter. Hence, the evidence was relevant, and should not have been excluded based upon the State's contrary argument.

However, we conclude that the trial court did not err in refusing to admit the evidence. As argued by the State before the trial court, prior to the journal's tender, no proper foundation was laid to authenticate it. No attempt was made to identify Amanda as the author of the journal entries, and it is axiomatic that before a written declaration may be admitted into evidence, it must be proved to be genuine.[18] Furthermore, no attempt was made to establish that the journal entries possessed an inherent guarantee of trustworthiness, which would have been necessary to admit them under the necessity exception to the rule against hearsay evidence.[19] Accordingly, it was not error to exclude the journal entries, and this enumeration is rejected.

7. State's witness Nolan testified that approximately one month after the murder, Fetty's co-defendant, Carper, told Nolan that he (Carper) had killed Amanda, while Fetty sat in the car parked in front of Amanda's house. On cross-examination, co-defendant Carper sought to impeach Nolan with Nolan's videotaped statement to police. In that videotaped statement, Nolan had stated that Carper told him that Fetty had paid Carper to commit the murder. Fetty objected to admission of the videotape, claiming (1) that it contained only Nolan's speculation that Carper was paid by Fetty to commit the murder, and (2) that it violated *Bruton v. United States,* because admitting Carper's hearsay statements inculpating Fetty violated the latter's Sixth Amendment right of confrontation.[20] The trial court sustained Fetty's objection.

Thereafter, outside the jury's presence, Carper proffered portions of the videotape in which Nolan recounted Carper's hearsay

---

[17] *Owens v. State,* 248 Ga. 629, 630 (284 SE2d 408) (1981).

[18] *Gunter v. State,* 243 Ga. 651, 657 (256 SE2d 341) (1979); OCGA §§ 24-7-6; 24-7-7.

[19] See *Newport Timber Corp. v. Floyd,* 247 Ga. 535, 541 (277 SE2d 646) (1981); *Page v. State,* 237 Ga. 20, 21 (227 SE2d 8) (1976).

[20] 391 U. S. 123, 136-137 (88 SC 1620, 20 LE2d 476) (1968).

statements that Fetty paid Carper to kill Amanda, and that after the murder, Carper had gone to Fetty's house to collect that payment. After hearing the proffer, the trial court ruled that *Bruton* did not apply,[21] and appears to have affirmed the State's position that a sufficient showing of a conspiracy had been established to permit admitting the videotaped statements under the co-conspirator exception to the rule against hearsay. The proffered portions of the videotape then were played for the jury.

On appeal, Fetty claims that, assuming a conspiracy did exist at the time Carper made his hearsay declarations to Nolan, the conspiracy ended when those declarations were made, and thus Carper's statements are admissible only against himself. We reject this argument. It is true, of course, that a conspirator's post-arrest statement to police incriminating a co-conspirator terminates the conspiracy,[22] rendering the statement admissible only against the declarant.[23] In this case, however, Carper's statements were made not to the police, but rather to an acquaintance, and thus the making of the statements did not end the conspiracy.[24] Moreover, at the time the hearsay statements were allowed, the State had introduced evidence that (1) Carper had supplied Fetty with the murder weapon; (2) Fetty and Carper had traveled together to Amanda's house and approached the house only when they knew Amanda was alone; and (3) Fetty and Carper were together at the house when the murder was committed. That evidence was sufficient to establish a prima facie case of conspiracy to commit the murder,[25] and it is axiomatic that once that showing is made, a conspirator's declarations made in furtherance of the conspiracy are admissible against co-conspirators.[26]

Furthermore, under the criteria set forth by the United States Supreme Court, Carper's statements to Nolan contained sufficient indicia of reliability to warrant their admission as statements made during the concealment phase of a conspiracy. First, at the time he made his statements, Carper had personal knowledge of the identi-

---

[21] This ruling was correct. Carper's hearsay statements were made to an acquaintance after the crime, and before his arrest. Thus, they are considered to be declarations of a co-conspirator, rather than confessions, and properly are analyzed under the criteria discussed infra in this division. *Copeland v. State*, 266 Ga. 664, 666 (469 SE2d 672) (1996).

[22] *Gunter*, supra; *Crowder v. State*, 237 Ga. 141 (227 SE2d 230) (1976).

[23] See OCGA § 24-3-52.

[24] *Jones v. State*, 265 Ga. 84, 85 (453 SE2d 716) (1995).

[25] Id.

[26] OCGA § 24-3-5; *Knight v. State*, 239 Ga. 594 (238 SE2d 390) (1977). Even though the hearsay statements in this case were admitted for the purpose of impeaching Nolan's testimony, in order to safeguard the right of a fair trial, we have examined the hearsay statement's potential impact on the Sixth Amendment rights of an accused. See *Bruton*, 391 U. S. at 135-136 (discussing the likely impact made upon jurors' minds by a co-conspirator's extrajudicial statements, even if such statements are admitted for a limited purpose).

ties and roles he and Fetty played in the murder, and cross-examination would not have shown that Carper was unlikely to know whether Fetty was involved in the crime.[27] Second, there is very little possibility that Carper's statements were based upon faulty recollection due to remoteness, as the statements were made approximately one month after the murder.[28] Third, the circumstances under which Carper made his statements do not suggest that he misrepresented Fetty's involvement in the murder.[29] In fact, if anything, Carper's declarations inculpated himself to at least an equal, if not greater degree, than Fetty. Finally, it is true that Carper's statements were express assertions of past facts that would leave little for the jury to infer. While that factor does weigh against their reliability,[30] standing alone it cannot offset our conclusion that the other three factors weigh heavily in favor of reliability.[31]

Therefore, because Carper's hearsay statements were admissible under the co-conspirator exception to the rule against hearsay, as a conspirator's declarations made during the concealment phase of a conspiracy, we conclude that the trial court did not err by overruling Fetty's objection and permitting the jury to hear portions of the videotape containing Nolan's account of Carper's hearsay statements.[32]

8. Fetty moved for a mistrial after claiming that jurors had seen him in handcuffs. However, in support of that motion, Fetty did not attempt to have jurors questioned about what they had, or had not, seen, and did not pursue the issue other than to raise his motion. Under those circumstances, the trial court did not abuse its discretion in denying Fetty's motion for mistrial.[33]

9. Finally, Fetty claims that the State improperly impeached him on his post-arrest silence, and that the State made improper comments in the jury's presence regarding such silence. Our review of the transcript reveals no instance where Fetty objected at trial to

---

[27] *Dutton v. Evans*, 400 U. S. 74, 88-89 (91 SC 210, 27 LE2d 213) (1970) (plurality opinion).

[28] Id. We do note that Nolan stated that he and Carper had been drinking before Carper made his declaration, but do not believe that factor, standing alone, renders the statement unreliable. In fact, the transcript shows that Nolan also stated that he coaxed Carper by reminding him of their long-standing friendship before convincing the latter to make his declaration concerning the murder.

[29] Id.

[30] Id.

[31] *Copeland*, 266 Ga. at 665.

[32] Fetty also claims that the trial court erred by failing to charge the jury that it could not consider Carper's hearsay statements, until it first determined beyond a reasonable doubt that a conspiracy had been established. Our review of the record shows that Fetty failed to request that the trial court give such a charge, and hence this enumeration is waived on appeal. *Thompson v. State*, 265 Ga. 677, 679 (461 SE2d 528) (1995).

[33] *Smith v. State*, 267 Ga. 502, 503 (480 SE2d 838) (1997).

these purported improprieties, thus this enumeration is waived on appeal.[34] Nor do we discern an instance in the transcript where the prosecution improperly commented on Fetty's pre-trial silence, as alleged.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

DECIDED SEPTEMBER 15, 1997.

*Anthony L. Harrison,* for appellant.

*Stephen D. Kelley, District Attorney, George C. Turner, Jr., Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Deborah L. Gale, Assistant Attorney General,* for appellee.