A98A2454. DALTON v. THE STATE.
A98A2455. BISHOP v. THE STATE.
A98A2456. SIMMONS v. THE STATE.
(513 SE2d 745)

POPE, Presiding Judge.

James Ricky Dalton, Charles Edwin Bishop and Steven Bryan Simmons appeal from the trial court's denial of their motions for new trial following their convictions for armed robbery, aggravated assault, possession of a firearm during the commission of a felony and possession of a sawed-off shotgun. We affirm. "On appeal the evidence must be viewed in the light most favorable to support the verdict, and [appellants] no longer enjoy[ ] a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." (Citations and punctuation omitted.) *Short v. State*, 234 Ga. App. 633 (507 SE2d 514) (1998); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Beaverdale Superette Robbery*

Viewed in that light, the evidence shows that on September 1,

1995, Clyde Queen, owner of the Beaverdale Superette in Whitfield County, Georgia, reported that his small maroon pick-up truck had been stolen. Queen had left the truck in the parking lot of his store the previous evening, with a load of garbage and a weed-eater in the truck bed. When he returned the next morning, it was gone. Deborah Simmons testified that at or around this same time, her husband, appellant Steve Simmons, drove her from their home in Tennessee to the Beaverdale Superette to look for appellants Dalton and Bishop. Steve Simmons told her that Bishop and Dalton had gone there earlier in the day to rob a man, and they had not returned. He was concerned that the store owner had killed them. They found the store closed, so after driving around for a while, they drove back to Tennessee. When they returned home, they found Dalton and Bishop waiting for them, sitting on the tailgate of a red pick-up truck, with a weed-eater in the back.

The following week, on September 7, 1995, Queen arrived at the Beaverdale Superette shortly before 7:00 a.m. to open the store. A small blue-gray car followed him into the store parking lot and pulled between the store and the gas pumps. As Queen walked to his store, he was carrying a brown paper sack with several blue bank bags inside containing around $25,000 in cash and $7,000 in checks. A man then got out of the passenger side of the blue-gray car and, without saying a word, shot Queen in the head with a sawed-off shotgun. The man took the paper bag and got back in the car, which sped away. Although seriously injured, Queen survived the shooting.

Later that morning, police officers recovered a shotgun and paper bag with fresh blood on it along the road between the store and the Tennessee state line. About a week later, three blue bank bags containing checks made out to the Beaverdale Superette were discovered in a ditch beside the same road. Subsequent testing by the GBI determined that the shotgun police found matched shotgun wadding found at the scene of the robbery and that the blood on the paper bag belonged to Queen.

Donald Ray Hyatt, who was indicted along with appellants and pled guilty to one count of armed robbery, testified at trial that early on the morning of September 7, he was out riding with Bishop in a blue car belonging to Bishop's wife. After stopping to pick up Dalton and Steve Simmons, the four headed from Tennessee into Georgia. They sat at a church for a while, and when they saw Queen's car go by, they pulled out and followed him into the store parking lot. Queen was walking to the store with a paper bag in his hand when Dalton jumped out of the back passenger seat and shot Queen in the side of the head. Dalton picked up the bag, jumped into the car and they sped off. As they drove back to Tennessee, they removed the money from the bags and threw the shotgun and the bags out the car

window. They went to Steve Simmons' apartment, where they divided the money. Hyatt testified that he got $2,000 to keep his mouth shut and the others divided the rest of the money. Bishop then drove Hyatt back to the motel where he was staying.

Debbie Simmons testified that on the morning of September 7, she received a call at work from Steve Simmons asking her to pick him up from a nearby fast food restaurant. He was locked out of their apartment, and a neighbor had given him a ride to the restaurant so he could call her. Steve Simmons told his wife over the phone that he had enough money to choke her. After she picked him up, they drove back to the apartment where Dalton was waiting. Steve Simmons then took her into the bathroom and showed her $7,000 in cash. Later that day, Debbie and Steve Simmons drove Dalton to his sister's house so he could "lay low" for a few days. That evening, Debbie Simmons saw a television news report about the Beaverdale Superette robbery and asked Steve Simmons if they had shot a man for the money, and he said, "yes." She also later heard Steve Simmons describing the shooting to someone in her presence and identifying Dalton as the shooter. Debbie Simmons testified that her husband used part of the $7,000 from the robbery to buy an old black Ford Mustang.

In addition, David Lee Couch, Debbie Simmons's son-in-law, testified that Steve Simmons had told him about the robbery the day it happened. Steve Simmons said that Bishop had been driving and that Dalton had shot the man. David Couch also testified that Bishop himself had admitted his participation in the robbery.

The state also presented evidence that on the day that the appellants were arrested, Bishop's father-in-law sold the small blue-gray Dodge car belonging to Bishop's wife. Hyatt identified the car as the car used in the robbery, and various other witnesses identified the car as being similar to the car involved.

*Deep Springs Superette Robbery*

On the morning of September 21, 1995, Bill Lively, the owner of the Deep Springs Superette in Whitfield County, Georgia, arrived at his store shortly after 7:00 a.m. He carried several red bank bags as he walked to his store and began unlocking the gates covering the entrance. The bank bags contained about $5,000 in cash and $5,000 in food stamps and checks. As Lively got one lock undone and was in the process of unlocking the second one, he saw a black car pull up between the gas pumps and the store. A man got out with a sawed-off shotgun in his hand and said, "Give me that money bag." Lively threw down the money bag and began running to his car. The man then shot him in the back of the head, grabbed the money bag and the car took off. Lively was able to summon help and survived the shooting.

At trial, a witness testified that sometime between 7:00 and 7:30 a.m., he observed a black Mustang, followed by a blue Dodge truck speeding down the road between the store and the Tennessee state line. He observed two people in the Mustang and one in the truck.

David Couch, who was indicted along with the appellants and pled guilty to one count of armed robbery, testified that Steve Simmons asked him to participate in the robbery at the Deep Springs Superette. About a week before the robbery, Steve Simmons drove David Couch and Dalton to Georgia, where they saw the Deep Springs Superette and the route they were going to take to and from Tennessee. David Couch and his wife, Stephanie, spent the night of September 20 with Steve and Debbie Simmons at their apartment. That night he and Steve Simmons discussed plans for the robbery. He also watched Steve Simmons saw off the barrel and stock of a 12-gauge shotgun to create a pistol grip.

On the morning of September 21, Dalton, Steve Simmons and David Couch left the apartment, with Steve Simmons driving his blue Dodge truck and David Couch driving Steve Simmons' black Mustang. Dalton rode as a passenger in the Mustang and carried the shotgun. They arrived early and pulled onto a side street to wait. They saw Lively drive by a few minutes after 7:00 a.m., and David Couch and Dalton followed in the Mustang. Steve Simmons stayed in the truck further down the road. Lively was unlocking the gate when they arrived, and Dalton got out of the car with the shotgun. David Couch chose not to look at what transpired, but heard Dalton tell Lively to give him the money and heard the man trying to run. He then heard a gunshot. Dalton got back into the car with two red money bags, and they drove off. Steve Simmons pulled in behind them and they returned to Tennessee, where Dalton dropped the shotgun into a creek. They returned to the Simmons' apartment where Stephanie Couch and Debbie Simmons remained, and the three men divided the money.

Debbie Simmons testified that prior to the September 21, 1995 robbery, she had gone with Steve Simmons to scout out locations and to obtain a shotgun from his mother. She said that the Couches spent the night with them the evening of September 20, and she heard Steve Simmons talking about how the robbery was going to occur: Steve Simmons and David Couch were to drive the vehicles and Dalton was to do the shooting. She also observed Steve Simmons and David Couch saw the barrel off the shotgun that night.

The next morning Steve Simmons and David Couch left, and she noticed that they had taken both the pick-up truck and the black Mustang. Later that morning, they returned with Dalton and David Couch, and Debbie Simmons saw two red money bags lying on the couch. She heard Steve Simmons and Dalton laughing and talking

about how the man had screamed, and they made fun of David Couch because he was pale and quiet and appeared to be in shock. Debbie Simmons said that she and Steve Simmons later drove Dalton either home or to his job. On the way, they stopped at a wooded area on a back road near her apartment. Dalton had the red money bags hidden in a shirt, and Steve Simmons told him to go bury them. Dalton got out and hid them in the woods. Several months after the appellants were arrested, Debbie Simmons took authorities to the wooded area where they discovered the red bank bags.

Stephanie Couch also testified that she discussed the planned robbery with her husband on the evening of September 20 when they spent the night at her mother's apartment. The next morning she heard sounds of Steve Simmons cooking, and heard him say that it was time to go pick up Rick. David Couch and Steve Simmons later left in the blue truck and the black Mustang. They returned about 7:20 that morning. David Couch handed her $1,600 in cash and was very pale and quiet.

Dalton took the stand to deny his involvement in the crimes. His employer also testified and produced work records, which he said indicated that Dalton had been at work on September 7 and 21, 1995. However, on cross-examination, the state demonstrated that the records the employer had for September 7 actually reflected work done during July 1995, and that the records from September 21 did not indicate the time Dalton arrived at work.

## Case No. A98A2454

1. As his first enumeration of error, Dalton argues that the trial court erred in allowing Debbie Simmons and Stephanie Couch to testify as to hearsay statements made by Steve Simmons and David Couch implicating Dalton. Dalton asserts that the state failed to prove a conspiracy to support the admission of these statements. The state argues that these statements were admissible under the exception to the hearsay rule allowing statements of co-conspirators. OCGA § 24-3-5.

> "Hearsay statements made by a conspirator during the course of a conspiracy, including the concealment phase, are admissible against all conspirators. . . . Moreover, the trial judge may admit testimony or statements by co-conspirators before the conspiracy has been proved, provided that such existence is afterwards shown during the trial." (Citations and punctuation omitted.) *Guerra v. State*, 210 Ga. App. 102, 105 (3) (a) (435 SE2d 476) (1993).

*Blue v. State*, 212 Ga. App. 847, 849 (3) (443 SE2d 635) (1994).

The state does not need to prove an express agreement between the parties in order to establish a conspiracy. "The essence of conspiracy is a common design, and conduct which discloses a common design may give rise to the inference of conspiracy. [Cit.]" *Waldrip v. State*, 267 Ga. 739, 747 (10) (b) (482 SE2d 299) (1997). "Presence, companionship and conduct before and after the commission of the alleged offenses may be considered by the jury and are circumstances which may give rise to an inference of the existence of a conspiracy. [Cit.]" (Punctuation omitted.) *Guerra v. State*, 210 Ga. App. at 103 (1). Thus, a conspiracy may be proven by direct or circumstantial evidence. Id.

Dalton complains that the court erred in allowing Debbie Simmons to testify regarding Steve Simmons' statement the week before the Beaverdale robbery that Dalton and Bishop had gone to Georgia to rob Queen. The state presented Hyatt's testimony as to Dalton's participation in the Beaverdale robbery. In addition, Debbie Simmons testified regarding Dalton's presence at her apartment with Steve Simmons the morning of the robbery and that a week before the crime Steve Simmons took her to the Beaverdale Superette to look for Dalton and Bishop and that they returned to find Dalton and Bishop in possession of a truck remarkably similar to that stolen from the victim. The jury could have inferred from this evidence a common design among Steve Simmons, Dalton and Bishop to commit armed robbery, a design that could have begun at least a week before the crime actually occurred. See *Waldrip v. State*, 267 Ga. at 747. Accordingly, Steve Simmons' statement explaining why they were going to look for Dalton and Bishop was admissible under the co-conspirator exception to the hearsay rule. See *Waldrip v. State*, 267 Ga. at 747 (10) (c); *Fetty v. State*, 268 Ga. 365, 371 (7) (489 SE2d 813) (1997).

Dalton also argues that the court erred in allowing Debbie Simmons and Stephanie Couch to testify regarding statements made by David Couch and Steve Simmons prior to the Deep Springs robbery. The state presented David Couch's testimony of Dalton's participation in the Deep Springs robbery, including a trip that David Couch, Steve Simmons and Dalton made a week before the crime to scout out the store. This evidence was corroborated by Debbie Simmons' testimony that Dalton returned with David Couch and Steve Simmons on the day of the Deep Springs robbery and that Dalton hid the bank bags. The jury could have found from this evidence that Dalton, Steve Simmons and David Couch had come "to a mutual understanding to accomplish or pursue a criminal objective" and thus inferred that a conspiracy existed at least a week prior to the crime. See *Duffy v. State*, 262 Ga. 249, 250 (1) (416 SE2d 734) (1992). Therefore, statements by David Couch and Steve Simmons referring to Dalton's

planned involvement prior to the Deep Springs robbery were admissible against him. See *Waldrip v. State*, 267 Ga. at 747 (10) (c); *Fetty v. State*, 268 Ga. at 371 (7).

2. Dalton also contends that the evidence at trial was insufficient to support his conviction. The arguments raised by Dalton go to the weight and credibility of the evidence presented by the state. "[But] questions as to the credibility of witnesses are within the exclusive province of the jury. On appeal of a criminal conviction this Court does not weigh the evidence or determine the credibility of witnesses, but determines the sufficiency of evidence." (Citations and punctuation omitted.) *Horne v. State*, 231 Ga. App. 864, 865 (1) (501 SE2d 47) (1998); *Short v. State*, 234 Ga. App. at 633; *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Because we find that the evidence was sufficient to support the verdict against Dalton, we affirm the trial court's denial of Dalton's motion for new trial.

### Case No. A98A2455

3. Bishop raises two enumerations of error. First, he asserts that the evidence was insufficient to support the verdict against him and second, that the testimony of Hyatt regarding Bishop's participation in the crime was uncorroborated. The primary evidence against Bishop came from the testimony of Hyatt, who was also charged in the Beaverdale robbery. While Georgia law does not allow a conviction based upon the uncorroborated testimony of an accomplice, OCGA § 24-4-8, such testimony may be corroborated by "[s]light evidence from an extraneous source identifying the accused as a participant in the criminal act." *Williams v. State*, 234 Ga. App. 191 (1) (506 SE2d 237) (1998). The corroborating evidence may be circumstantial and may come from the testimony of other accomplices to the crime. *Hanifa v. State*, 269 Ga. 797, 808-809 (7) (505 SE2d 731) (1998); *Williams v. State*, 234 Ga. App. at 191.

At trial, Hyatt gave a detailed account of the events surrounding the Beaverdale robbery and Bishop's role as driver. This testimony was corroborated by Debbie Simmons' testimony that she and Steve Simmons drove to the Beaverdale Superette the week before the robbery to find Bishop and Dalton, who had gone there to rob Queen. When they did not find Bishop and Dalton, they returned home where they discovered Bishop and Dalton sitting on the tailgate of a truck matching the description of the one stolen from Queen at the time. Hyatt's testimony was further corroborated by the testimony of Queen and others describing the car involved in the robbery and identifying a picture of Bishop's wife's car as being similar to the car involved. The evidence that Bishop's father-in-law tried to sell this car the day Bishop was arrested for the Beaverdale robbery provided

further support. Moreover, David Couch testified that Bishop admitted his participation in the robbery. We find that this evidence sufficiently corroborates Hyatt's testimony and that the evidence at trial was sufficient to support Bishop's conviction. See *Hanifa v. State*, 269 Ga. at 808-809 (7); *Williams v. State*, 234 Ga. App. at 192 (1); *Horne v. State*, 231 Ga. App. at 865 (1). Compare *Brookshire v. State*, 230 Ga. App. 418 (496 SE2d 757) (1998) (where the only corroborating evidence was the "mere spatial proximity" of the defendant to the contraband).

*Case No. A98A2456*

4. Simmons also raises as his first two enumerations of error that the evidence was insufficient to support his conviction and that the testimony of the accomplices to the robberies was not sufficiently corroborated.

Hyatt testified as to Simmons' participation in the Beaverdale robbery. Hyatt's testimony was corroborated by Debbie Simmons' evidence that Simmons called her on the day of the robbery, showed her $7,000 and later that evening admitted that he had been involved in the Beaverdale robbery and the shooting of Queen. It was further corroborated by David Couch's testimony that Simmons had admitted participating in the Beaverdale robbery.

David Couch testified regarding Simmons' participation in the Deep Springs robbery. This testimony was corroborated by the testimony of Debbie Simmons and Stephanie Couch as to the events the evening before and the morning of the robbery. The evidence that Simmons owned a black Mustang and a blue Dodge truck and that witnesses could place two such vehicles in the vicinity of the robbery provided additional support.

We find that the record contains sufficient evidence both to corroborate the accomplice's testimony and to support Simmons' conviction. See *Hanifa v. State*, 269 Ga. at 808-809 (7); *Smith v. State*, 234 Ga. App. 586, 593-594 (7) (b), (c) (506.SE2d 406) (1998); *Williams v. State*, 234 Ga. App. at 192 (1); *Horne v. State*, 231 Ga. App. at 865 (1).

5. In his next enumeration of error, Simmons argues that the trial court erred in admitting into evidence a sketch of the Beaverdale robbery scene drawn by Deputy Bobby Elrod, based upon the testimony of Officer Bryan Dyer, who assisted Elrod in preparing the sketch by taking measurements. Even assuming that it was error to admit the sketch based on Dyer's knowledge of the scene, such error was harmless because Deputy Elrod testified later in the trial and he authenticated the sketch himself.

6. Simmons' next two enumerations assert that the trial court erred in allowing testimony by David Couch and Debbie Simmons as

to statements that Steve Simmons made after the Beaverdale robbery, but before the Deep Springs robbery. He argues that these statements do not fit into any exception to the hearsay rule because the conspiracy with regard to the Beaverdale robbery was over at the time the statements were made.

However, Simmons raised no objection to this testimony at trial.

Although one of [Simmons'] co-defendants objected, that objection did not inure to [Simmons'] benefit because he did not join in it. Where a defendant does not expressly adopt the objection of a co-defendant, he thereby waives that objection and may not utilize it to gain review. [Cit.]

(Punctuation omitted.) *Williams v. State*, 233 Ga. App. 217, 219 (2) (504 SE2d 53) (1998).

Even if the objection had been preserved, however, we find that this statement did fit within the conspiracy exception to the hearsay rule because the jury could have inferred from the evidence that (1) a conspiracy to conceal the Beaverdale robbery was still in place at the time the statement was made or (2) an agreement to engage in the Deep Springs robbery was already underway. Because Simmons was a party to both conspiracies, the evidence was properly admissible against him. See *Waldrip v. State*, 267 Ga. at 747 (10) (c); *Fetty v. State*, 268 Ga. at 371 (7).

7. Simmons also contends that the trial court erred in allowing Detective Wayne Saylors to testify regarding the consistency between information given to him by David Couch and Hyatt and by an unknown tipster. He argues that, in effect, the court allowed Saylors to give hearsay testimony as to what the tipster said.

Once again, Simmons failed to pose his own objection, and thus waived this ground for appeal. *Williams v. State*, 233 Ga. App. at 219 (2). Nevertheless, we find that even if the admission of this testimony was error, it was harmless because it was merely cumulative of other properly admitted evidence. *Jenkins v. State*, 268 Ga. 468, 470 (2) (491 SE2d 54) (1997); *Smith v. State*, 266 Ga. 827, 831 (4) (470 SE2d 674) (1996).

8. Simmons further contends that the trial court erred in admitting into evidence an empty shotgun shell because its connection to the crime was not established. David Couch testified that Dalton threw the 12-gauge shotgun used in the Deep Springs robbery into a creek just over the Tennessee line. Although authorities never located the gun, the state introduced into evidence a 12-gauge shell found at the site identified by David Couch. We find that the shotgun shell was properly admitted as evidence in support of David Couch's testimony.

*Judgments affirmed. Beasley, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 19, 1999 —
RECONSIDERATION DISMISSED MARCH 24, 1999 —

*Michael A. Corbin*, for appellant (case no. A98A2454).

*Coppedge, Leman & Ward, James T. Ward*, for appellant (case no. A98A2455).

*Goddard, Thames, Hammontree & Bolding, Matthew D. Thames*, for appellant (case no. A98A2456).

*Kermit N. McManus, District Attorney*, for appellee.