310 Ga. 762
FINAL COPY

S20A1093.  SUGGS v. THE STATE.

BOGGS, Justice.

Appellant Kalvin Tyrone Suggs challenges his 2017 convictions for malice murder and other crimes in connection with the shooting death of Tony Harrison. Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions. He also contends that the trial court erred in denying his pretrial motion regarding voir dire, thereby forcing him to question all the prospective jurors together; rejecting his challenge to an allegedly racially discriminatory peremptory strike; denying his motion in limine to exclude evidence derived from a surreptitious audio recording of a conversation; and admitting 21 crime scene and autopsy photographs. He further contends that the court did not follow the proper procedure when receiving a communication from

the jury and that he was denied the effective assistance of counsel. For the reasons that follow, we affirm.[1]

1.    Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the night of February 28-March 1, 2015, Appellant rode with his friend Patrick Pridgen to the Jackpot Club in the Sunset Plaza shopping center in Moultrie. Appellant was wearing black pants and a black and white shirt. At around 1:30 a.m., Appellant got into a fight with Harrison and

---

[1] The shooting occurred on March 1, 2015. In September 2015, a Colquitt County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, three counts of possession of a firearm during the commission of a felony, and two counts of possession of a firearm by a convicted felon (one for a firearm on the date of the shooting, and the other for a different firearm on the date of his arrest). In August 2016, Appellant entered a non-negotiated guilty plea under *North Carolina v. Alford*, 400 U. S. 25 (91 SCt 160, 27 LE2d 162) (1970), to involuntary manslaughter in exchange for the State's agreement to dismiss all other pending charges, which he withdrew in March 2017. At a December 2017 trial, the jury found Appellant guilty of all charges. In February 2018, the trial court sentenced Appellant to serve life in prison for malice murder, five years consecutive for possession of a firearm during the commission of a felony, and consecutive terms of five years each for the two felon-in-possession convictions. The felony murder verdict was vacated by operation of law, see *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993), and the court merged the other guilty verdicts. Appellant filed a timely motion for new trial, which he amended with new counsel in July 2019. After an evidentiary hearing, the court denied the motion in November 2019. Appellant filed a timely notice of appeal, and the case was docketed to this Court's August 2020 term and submitted for a decision on the briefs.

Harrison's brother, Dontavious Jackson, and Harrison and Jackson severely beat Appellant. The club's owner, Israel Shaw, helped break up the fight and told his bouncers to clear the club.

As the large crowd spilled into the parking lot, Timothy Davis offered Harrison and Jackson a ride home, and the three men walked to Davis' car. Tamera Edwards drove up with her boyfriend and parked next to Davis. Harrison was standing between the two cars when gunfire erupted from a 9mm pistol one row over in the parking lot, striking the side of Edwards' car and shattering her back window. Harrison pulled his own 9mm pistol and returned fire, getting off seven rounds before he was hit in the right upper chest and fell to the ground. The bullet that struck Harrison went through his right lung, windpipe, aorta, and left lung before exiting through his upper left arm. Appellant jumped into a Chevrolet Camaro convertible that his cousin was driving and was dropped off at the Northgate Apartments.

Harrison was pronounced dead at the scene. Law enforcement officers recovered two sets of 9mm shell casings from the parking lot

3

– seven shell casings from around and under Harrison's body that matched the pistol lying by his left foot, and 12 shell casings nearby that were fired from a different 9mm pistol, which was never found.

At around 3:00 a.m. on March 1, 2015, Appellant called Pridgen, and Pridgen picked him up at the Northgate Apartments. At Appellant's request, Pridgen drove Appellant to Appellant's sister's house in the Atlanta area, dropping him off at around 6:30 a.m. before driving back to Moultrie. The next day, Appellant called Pridgen, who drove to Atlanta, picked up Appellant, and brought him back to Moultrie. Both on the way up to Atlanta and on the way back to Moultrie, Appellant told Pridgen that he was in the parking lot "ducking and shooting" after the club shut down on the night that Harrison was shot.

On the afternoon of March 3, Kaysha Trim agreed to meet with GBI agents at a cemetery in Moultrie to discuss the shooting. In an audio-recorded interview, which was later played for the jury, Trim told the agents that she knew Appellant and that she saw Harrison and Jackson beat him up inside the club. Trim said that after the

4

club closed, she was in the parking lot walking to her car when she saw Appellant, who was standing near her car, fire multiple shots in Harrison's direction and saw Harrison fall to the ground.

Later that afternoon, Appellant contacted the GBI to make a statement. Appellant told agents that Harrison and Jackson beat him up inside the club and that he passed two police officers on his way out but did not report the fight to them.[2] Appellant claimed that he was walking toward Pridgen's car when the shooting started, that he ran to the other end of the parking lot, and that someone he did not know picked him up in a black truck and drove him to his ex-girlfriend's house, where he stayed in seclusion in a shed in her backyard for the next two days without her knowledge. Appellant said that when he left the shed, he went to his parents' house, where he was notified that law enforcement was requesting to speak with him. Appellant could not describe the individual who picked him up or the truck (beyond the fact that it was black), he did not know how

---

[2] Two off-duty Moultrie Police Department officers were working a security detail for the club in the parking lot that night.

5

the driver knew to take him to his ex-girlfriend's house, and his description of the inside of the shed did not match what GBI agents found when they searched it after the interview ended. Appellant turned over khaki pants and a red shirt that he claimed he was wearing at the time of the shooting.

On March 5, the GBI received cell phone tower location records for Appellant's and Pridgen's phones. During an interview with Pridgen, GBI agents confronted him with the records, and Pridgen admitted that he drove Appellant to Atlanta after the shooting and brought him back to Moultrie the next day. Pridgen agreed to go speak with Appellant and record him with a device provided by the GBI. Shortly after 5:00 p.m., Pridgen went to the home of one of Appellant's relatives and spoke to Appellant, who asked Pridgen what he told the GBI and whether the GBI asked him about a gun. Appellant told Pridgen to contact the GBI and say that he lied about taking Appellant to Atlanta after the shooting and that he instead took someone else who had Appellant's phone. An audio recording of the conversation was later played for the jury.

6

At 7:06 p.m. on March 5, Appellant was riding with his father in his father's truck when a GBI agent conducted a traffic stop and arrested Appellant. During a search of the truck, the agent found a loaded firearm in the passenger-side door compartment next to where Appellant was sitting, which Appellant, as a convicted felon, was not allowed to possess.

Appellant contends that the evidence was legally insufficient to support his convictions. When viewed in the light most favorable to the verdicts, however, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.     Appellant contends that the trial court erred in denying his pretrial motion to conduct individual voir dire of the prospective jurors one-by-one or, alternatively, in panels of 12 at a time, thereby forcing him to conduct individual voir dire of all the prospective jurors together. Appellant relies on *Lahr v. State*, 239 Ga. 813 (238 SE2d 878) (1977), where this Court stated that "voir dire questions are propounded to panels of 12 and defendant can question them in panels of 12 or individually but not en masse to the entire group of 48 jurors at one time." Id. at 814.

The trial transcript shows that the court divided the prospective jurors into groups of 12 and sat them in separate locations in the courtroom for voir dire. After the jury had been selected and the remaining prospective jurors were excused, Appellant complained that the court denied him the right to conduct individual voir dire with panels of 12 prospective jurors at a time. The court replied, "You did have that right, sir, you could have done it if you wanted to. They were sitting in panels of 12, if I'm not mistaken. Is that not true? I intentionally sat them in groups of 12,"

8

and Appellant acknowledged that the jurors were sitting in panels of 12. In its order denying Appellant's new trial motion, the trial court stated that Appellant "was told that he could question each panel completely before moving to the next panel if he so wished rather than en masse," and found that if Appellant questioned all the prospective jurors at one time, "that was a choice he made, not a directive of the court." Thus, Appellant has failed to show error. See *Perez v. State*, 258 Ga. 343, 344 (369 SE2d 256) (1988) (finding no reversible error where, in response to defendant's request to voir dire prospective jurors in panels of 12 at a time, trial court said, "'Well, you will have this twelve here, that twelve there and that twelve there'").

3.    Appellant claims that the trial court erred in rejecting his challenge under *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986), to the State's peremptory strike of an African-American prospective juror, Juror 33. *Batson* established a three-step process for evaluating claims of racial discrimination in the use of peremptory strikes:

(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven [the proponent's] discriminatory intent.

*Heard v. State*, 295 Ga. 559, 566 (761 SE2d 314) (2014) (citation and punctuation omitted). Appellant's *Batson* claim focuses on step two.

After Appellant raised his *Batson* challenge, the State explained that it struck Juror 33 because of photographs on her Facebook page that showed her "throwing up gang signs" and with marijuana, which a GBI special agent discovered while looking up all the prospective jurors on Facebook. Appellant argues that the trial court erred in concluding that the State gave a race-neutral explanation for striking Juror 33, because the State's explanation was not reasonable or plausible and was not based on Juror 33's conduct, mannerisms, or responses during voir dire. However, contrary to Appellant's argument, the second step of the *Batson* process

does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the

10

issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

*Purkett v. Elem*, 514 U. S. 765, 768 (115 SCt 1769, 131 LE2d 834) (1995) (citation omitted). Moreover, the reasons for striking prospective jurors need not come only from voir dire. See *Johnson v. State*, 302 Ga. 774, 781 (809 SE2d 769) (2018).

The State's proffered reason for striking Juror 33 — that she had photographs on her Facebook page showing her making gang signs and with marijuana — was race-neutral. See *Smith v. State*, 264 Ga. 449, 449-451 (448 SE2d 179) (1994) (holding that prospective juror's residence in public housing project where gang activity was prevalent was race-neutral explanation for peremptory strike); *Franklin v. State*, 305 Ga. App. 574, 577 (699 SE2d 868) (2010) (holding that prospective juror's involvement with drugs was race-neutral explanation for peremptory strike). Accordingly, Appellant's *Batson* claim fails.

11

4. Appellant also claims that the trial court erred in denying his motion in limine to exclude the audio recording that Pridgen secretly made of a conversation that he had with Appellant. Appellant relies on OCGA § 16-11-67, which says: "No evidence obtained in a manner which violates any of the provisions of this part [i.e., OCGA §§ 16-11-60 to 16-11-70] shall be admissible in any court of this state except to prove violations of this part." However, the provision that governs audio recordings is OCGA § 16-11-62 (1), which says: "It shall be unlawful for . . . [a]ny person in a clandestine manner intentionally to overhear, transmit, or record . . . the private conversation *of another* which shall originate in any private place[.]" (Emphasis supplied.) It is well established that OCGA § 16-11-62 (1) "does not prohibit one party to a conversation from secretly recording or transmitting it without the knowledge or consent of the other party." *State v. Birge*, 240 Ga. 501, 501 (241 SE2d 213) (1978) (interpreting predecessor to OCGA § 16-11-62 (1)). Accord *Fetty v. State*, 268 Ga. 365, 366 (489 SE2d 813) (1997). Thus, Pridgen did not violate OCGA § 16-11-62 (1) when he made the audio recording of

12

his conversation with Appellant, and OCGA § 16-11-67 did not require the trial court to exclude the recording.

5. Appellant asserts that the trial court erred in admitting 21 crime scene and autopsy photographs, because "[t]he photographs of the bodies at the crime scene were repetitious of others," and "[t]here were autopsy photographs that . . . showed parts of the body which had no relevance to the crime alleged . . . and were introduced only to inflame the minds of the jury." However, more than 60 crime scene and autopsy photographs were admitted without objection at Appellant's trial, and Appellant has failed to identify, by citation to the relevant pages in the record, which specific subset of 21 photographs he is challenging, as required by this Court's rules. See Supreme Court Rule 19 n.1 ("[F]or briefs, . . . page references to the record (R-) and transcript (T-) are essential."). Moreover, his descriptions of what the 21 challenged crime scene and autopsy photographs depict, considered in light of his stated bases for challenging them, are simply too vague to enable this Court to isolate and evaluate the 21 allegedly objectionable

13

photographs. See *Henderson v. State*, 304 Ga. 733, 739 (822 SE2d 228) (2018) ("It is not this Court's job to cull the record on behalf of Appellant to find alleged errors . . . ." (citation and punctuation omitted)); *Roberson v. State*, 300 Ga. 632, 636 (797 SE2d 104) (2017) ("It is well established that the burden is on the party alleging error to show it by the record . . . ." (citation and punctuation omitted)). Accordingly, this claim provides no basis for reversal. See *Westmoreland v. State*, 287 Ga. 688, 696 (699 SE2d 13) (2010) (finding no basis for reversal where defendant challenged admission of "unspecified photographs 'of individuals that were not in issue'").

6. Appellant also asserts that the trial court did not follow the proper procedure when receiving a communication from the jury during deliberations, citing *Lowery v. State*, 282 Ga. 68 (646 SE2d 67) (2007). *Lowery* requires trial courts to ensure that jury communications are submitted to the court in writing, to mark any written communication as a court exhibit in the presence of counsel, to afford counsel a full opportunity to suggest an appropriate response, and to make counsel aware of the substance of the court's

intended response so that counsel may seek modifications to the response before the jury is exposed to it. See id. at 76. See also *Burney v. State*, 299 Ga. 813, 819 n.6 (792 SE2d 354) (2016) (discussing required procedure for jury communications to court from outside courtroom).

Here, less than two hours into deliberations, the jury sent the court a note that said: "Due to his personal view of evidence presented, one juror feels uncomfortable making a decision based on the evidence present." The trial transcript shows that the court marked this written jury communication as a court exhibit in the presence of counsel and discussed the note and the court's intended response with counsel before bringing in the jury, thereby affording counsel a full opportunity to seek any desired modifications before the jury was recharged.

Appellant does not challenge the *substance* of the recharge given to the jury in response to the jury note. Instead, he claims that the trial court failed to follow the *procedure* prescribed by *Lowery* for handling jury notes. But the record reflects that the trial court

15

complied with *Lowery*. Moreover, Appellant did not object at trial to the procedure that the court followed in handling the jury note here. Cf. *Lowery*, 282 Ga. at 73 (noting that trial counsel "voiced objection to the trial court's action"). Appellant therefore waived this claim and is not entitled even to plain error review. See *Miller v. State*, 302 Ga. 118, 120 n.2 (805 SE2d 22) (2017) (holding that plain error review is limited "to only certain types of errors, namely, (1) alleged errors in the sentencing phase of a death penalty trial; (2) certain improper comments by the trial judge in violation of OCGA § 17-8-57; (3) errors in jury instructions; and (4) evidentiary errors in trials occurring after January 1, 2013"). See also OCGA § 17-8-58 (b) (authorizing plain error review of any "portion of the jury charge").

7. Appellant contends that he was denied the effective assistance of counsel, pointing to numerous alleged errors by his trial counsel. A defendant's claim that his attorney's assistance was so inadequate as to require reversal of his conviction must prove both that the attorney's performance was professionally deficient and that this deficiency resulted in prejudice to his case. See

*Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must show that his counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We need not address both components of the inquiry if the defendant makes an insufficient showing on one. See id. at 697.

(a) Appellant points first to his trial counsel's alleged failure to adequately investigate the case. However, Appellant has not suggested, much less shown, what further investigation would have revealed or how it would have helped his defense. Thus, even if counsel had conducted an inadequate investigation, Appellant has failed to prove the required prejudice. See *Long v. State*, 309 Ga.

721, 728 (848 SE2d 91) (2020) (holding that in order to establish prejudice from failure to adequately investigate case, defendant must "'at least make a proffer as to what additional investigation would have uncovered'" (citation omitted)).

(b) Appellant also points to his trial counsel's conduct in connection with a plea agreement that Appellant entered into but was later allowed to withdraw. The record shows that on the eve of the scheduled trial, Appellant's trial counsel met in chambers with the prosecutor and the judge to discuss a potential plea agreement, and the prosecutor verbally agreed to allow Appellant to enter a guilty plea to involuntary manslaughter as a lesser included offense of malice murder in exchange for the dismissal of the remaining charges. Appellant claims that the prosecutor *also* agreed that Appellant would be sentenced to time served, and that his trial counsel was constitutionally deficient in failing to get this agreement, with the promise of no additional jail time, reduced to writing.

The record does not bear out Appellant's claim that the prosecutor verbally agreed to a sentence of time served. At a plea hearing a few days after the meeting in chambers, Appellant confirmed, with his trial counsel present, that he understood that "the maximum penalty the Court could impose" under the plea agreement was "ten years in the state penal system." The court also explicitly advised Appellant that his sentencing would take place at a later date, that the court was requesting a presentence investigation, that Appellant should provide to his trial counsel "[a]ny information you want me to review prior to that sentencing," and that Appellant would be placed on an ankle monitor and allowed to live with his parents "until sentencing." Moreover, although Appellant's trial counsel testified at the motion for new trial hearing that "according to the agreement, there would be a PSI [i.e., presentence investigation], but [Appellant] would not be sentenced to any more prison," counsel admitted that after the meeting in chambers, neither the prosecutor nor the judge remembered any

verbal agreement for Appellant to be sentenced to time served. Thus, Appellant has failed to show deficient performance.

(c)     Finally, in a single paragraph of his ten-page brief, Appellant recites a litany of decisions by his trial counsel that he asserts constituted deficient performance. Appellant contends that his trial counsel was constitutionally deficient in failing to object to the qualifications of two expert witnesses; failing to file "any type" of motion or ask for "any pretrial hearing" regarding software used by one of the expert witnesses; failing to seek funding to hire a firearms expert; failing to object to the admission of the 21 unspecified crime scene and autopsy photographs discussed above; and failing to request that the court reporter transcribe the entirety of voir dire. However, "'[s]uch after the fact disagreements about trial counsel's approach to the case . . . do not amount to a showing of ineffective assistance of trial counsel.'" *Armour v. State*, 290 Ga. 553, 555-556 (722 SE2d 751) (2012) (citation omitted). Moreover, Appellant has made "no effort to show that such conduct was the product of anything other than reasonable trial strategy or to

establish that any of these [alleged] shortcomings, individually or in the aggregate, had any effect on the outcome of the trial." *McDonald v. State*, 296 Ga. 643, 646 (770 SE2d 6) (2015). Accordingly, Appellant has failed to carry his burden to show that he was denied the effective assistance of counsel.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 15, 2021.
Murder. Colquitt Superior Court. Before Judge Hardy.
*Earle J. Duncan*, for appellants.
*Bradfield M. Shealy, District Attorney, April M. Hancock, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.